IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of: | ) | No. 31426-0-III |
| | ) | |
| ELIZABETH KIM, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | PUBLISHED OPINION |
| and | ) | |
| | ) | |
| ANATOLE KIM, | ) | |
| | ) | |
| Appellant. | ) | |

KULIK, J. — This is a bitterly contested dissolution and custody case following a marriage of 25 years. The father, Anatole Kim, appeals the trial court's order granting the mother's, Elizabeth Kim's, petition to relocate their children to California. Mr. Kim contends the trial court abused its discretion by failing to follow the correct legal standard and erred by disregarding cultural factors in evaluating relocation. He also maintains that the 60 percent/40 percent property division was inequitable and that the trial court erred by failing to include maintenance in the child support worksheets.

We conclude that the trial court did not err and did not abuse its considerable discretion. Finally, the findings made by the court are supported by substantial evidence.

Accordingly, we affirm the trial court.

## FACTS

Anatole Kim and Elizabeth Shizuoko Kim are both physicians. Mr. Kim is a cardiologist and Ms. Kim is a pathologist who, at the time of separation, had not practiced medicine for 14 years. The Kims met as students at Brown University during the 1982-83 school year and were married on August 3, 1985, in Los Angeles, California. After numerous moves around the country for residency programs and Mr. Kim's work, the family settled in Yakima in 2002.

The Kims have three children: E.K. (date of birth April 19, 1995), L.K. (date of birth June 26, 1998), and C.K. (date of birth December 11, 2000). The parties played different roles in raising the children. When E.K. turned two years old, Ms. Kim, who had been reducing her part time hours as a pathologist, resigned from her job and became a full-time, stay-at-home mother. Mr. Kim was the primary wage earner and worked long hours, while Ms. Kim performed the majority of parenting duties, including supervising the children's extensive activities and social networks.

Ms. Kim filed a petition for dissolution in July 2010. Upon separation, Ms. Kim was awarded temporary primary residential placement of the children. In April 2011, Ms. Kim filed a notice of intent to relocate to Los Angeles in order to update her skills in

2

pathology. The University of California at Los Angeles (UCLA) had offered her a surgical pathology fellowship beginning July 1, 2011. Because Ms. Kim had been out of the work force for well over two years, she was not eligible for a medical license in Washington State. In May 2011, a Yakima County court commissioner denied Ms. Kim's motion to relocate.

The parties' dissolution trial took place over several days in June 2012 and resumed in September 2012. The trial was bifurcated due to the guardian ad litem's (GAL's) failure to complete his report for the June trial. The court heard testimony from a number of witnesses on Ms. Kim's relocation request. At the conclusion of the trial, the court acknowledged that while it had considered the testimony of all the witnesses, it found the testimony of the parents the most significant.

Ms. Kim testified that she was working part time for a pathology group in San Antonio, Texas, when E.K. was born in 1995. She stated that she did 98 percent of the hands-on work of parenting and that when E.K. turned two, she resigned from her job. During that time, Mr. Kim was working about 80 to 100 hours per week, and Ms. Kim performed the majority of the childcare. This pattern continued after L.K. was born. She recalled that Mr. Kim could not remember holding L.K. because he was working well over 100 hours per week. When asked to describe her early caretaking of C.K., she

3

answered that she did "[p]retty much everything. [C.K.] nursed for two years and he was not home." Report of Proceedings (RP) (Sept. 4, 2012) at 35.

Ms. Kim continued to have primary responsibility for the day-to-day care of the children as they grew older. Ms. Kim described a typical preseparation school day as follows:

> I would wake up first. I would prepare breakfast and I always make their lunch, so I would get that out because I make it the night before. I would make sure the children got out of bed. I would make sure Anatole got— was awake. I'd prepare him what he usually had in the mornings. The children and I would have breakfast together. Anatole would usually walk through the kitchen.

RP (Sept. 4, 2012) at 46. Ms. Kim could not recall Mr. Kim ever taking the children to school or picking them up. Ms. Kim also testified that she volunteered in the children's school, drove them to their extracurricular activities, prepared dinner, and helped with homework.

Mr. Kim's testimony centered on the differences in the parents' respective parenting styles. He testified that he was more direct and that Ms. Kim tended to be more indulgent. He testified, "I do tend to suggest to the children and try and explain if I have a suggestion or advice. I think if [Ms. Kim] wants the children to do something, she mentions it in kind of an oblique way and then that's about it." RP (Sept. 5, 2012) at 206. He testified that Ms. Kim designated him the disciplinarian and deferred to him when the

4

children misbehaved.

Mr. Kim testified that the parties had conflict over some of the children's extracurricular activities and that Ms. Kim would disallow some activities if she found them "inconvenient." RP (Sept. 5, 2012) at 207. For example, Mr. Kim believed it was important to get the boys involved in Boy Scouts, but that Ms. Kim refused to meaningfully participate. Mr. Kim also testified that he thought the children should be given more responsibility, but that Ms. Kim found it easier to do household chores herself.

Mr. Kim asked for primary residential placement, stating that he alone was concerned about the children's best interests. Mr. Kim described his preseparation relationship with E.K. as "[v]ery close," and his current relationship with L.K. and C.K. as "stable" and "very warm," but noted that both were exhibiting some teenage rebellion. RP (Sept. 6, 2012) at 321-22. He also expressed his concern that Ms. Kim's move to California would effectively eliminate him as a parent.

The court appointed a GAL to evaluate residential placement provisions. The GAL recommended that the mother be awarded primary residential placement. However, as to relocation, the GAL concluded:

5

> [A] move by the mother is not best for the children. The mother would
> have to demonstrate an overwhelming need for her to do so. The issue here
> is the mother's occupational benefit of a move versus the needs of the
> children. The children need the involvement and balance of both parents,
> the benefit of both attachment and limits.

Clerk's Papers (CP) at 340.

The court also appointed Dr. Richard Adler, a child and adolescent psychiatrist, to conduct a forensic evaluation of E.K., who had experienced some serious psychiatric problems in December 2010. Dr. Adler concluded that relocation was "ill-advised" as it related to E.K.'s best interest, noting, "[t]his has been high-conflict divorce, marked by contested custody issues and prominent father-son alienation. [A] disposition that would only further hamper the likelihood of repairing the father-son relationship seems contraindicated." CP at 363.

After considering the appropriate statutorily mandated relocation factors and entering detailed findings of fact for each, the court granted Ms. Kim's petition to relocate. The court's findings of fact will be discussed in detail below as they relate to Mr. Kim's assignments of error.

## ANALYSIS

*Relocation.* Mr. Kim appeals the trial court's grant of Ms. Kim's petition to relocate the children to California. He contends the trial court abused its discretion

6

because it applied an incorrect legal standard in analyzing the relocation issue.

We review the trial court's decision to grant or deny a petition for relocation for an abuse of discretion. *In re Marriage of Horner*, 151 Wn.2d 884, 893, 93 P.3d 124 (2004); *Bay v. Jensen*, 147 Wn. App. 641, 651, 196 P.3d 753 (2008). A court abuses its discretion where the court applies an incorrect standard, the record does not support the court's findings, or the facts do not meet the requirements of the correct standard. *Horner*, 151 Wn.2d at 894 (quoting *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997)). We emphasize that trial court decisions in dissolution actions will be affirmed unless no reasonable judge would have reached the same conclusion. *In re Marriage of Landry*, 103 Wn.2d 807, 809-10, 699 P.2d 214 (1985). "The emotional and financial interests affected by such decisions are best served by finality. The spouse who challenges such decisions bears the heavy burden of showing a manifest abuse of discretion on the part of the trial court." *Id.* at 809.

In 2000, the legislature passed the child relocation act, RCW 26.09.405-.560 ("relocation act" or "the act"), which shifts the analysis away from the best interests of the child to an analysis focusing on the best interests of the child and the relocating person. LAWS OF 2000, ch. 21, §§ 1, 14; *Horner*, 151 Wn.2d at 886-87. RCW 26.09.520 provides the legal standard for determining a relocation issue. *Horner*, 151 Wn.2d at 895.

7

The trial court must consider the 11 factors listed in the relocation statute on the record to determine whether the detrimental effect of the proposed relocation outweighs its benefits. *Id.* at 894-95. The act creates a rebuttable presumption that the relocation will be allowed, which may be rebutted when the objecting party proves that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, based upon the [11 child relocation] factors." RCW 26.09.520. The factors are:

> (1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;
> (2) Prior agreements of the parties;
> (3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;
> (4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;
> (5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;
> (6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;
> (7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;
> (8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;
> (9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

8

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

RCW 26.09.520.

These factors are not listed or weighted in any particular order. RCW 26.09.520; *Horner*, 151 Wn.2d at 887. The trial court must find by a preponderance of the evidence that they show that relocation would be more detrimental than beneficial, and it must make findings on the record regarding each of the factors. *Horner*, 151 Wn.2d at 895-97.

Mr. Kim contends the trial court "created a novel legal standard" by analyzing the relocation issue in terms of the mother's "entitlement" and whether relocation was "appropriate." Appellant's Br. at 28. Pointing to RCW 26.09.002, which states that "the best interests of the child shall be the standard by which the court determines and allocates the parties' parental responsibilities," and *In re Marriage of Combs*, 105 Wn. App. 168, 19 P.3d 469 (2001), he contends a relocation analysis should focus on the best interests of the children and that "the relocating parent's individual interests must be subordinated to those of the children." Appellant's Br. at 27.

Mr. Kim's argument fails. First, his reliance on *Combs* is misplaced. *Combs* was decided in the trial court before the effective date of the relocation act. In that case, we held that a mother's statement that she might move out of state was relevant to at least

9

three of the factors considered under RCW 26.09.187(3) in establishing a parenting plan.

We stated:

> Relocation of a child to a different state certainly will affect his or her physical surroundings and thus would be directly relevant to factor (v). Depending on the circumstances, such a move also may be relevant to other factors, particularly (iii) and (iv). A plan to relocate a child to another state thus would be directly relevant to a determination of the child's best interests.

*Combs*, 105 Wn. App. at 175-76.

The three parenting plan factors identified by *Combs* to which relocation is, or

might be, relevant are:

> (iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3), including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child; [and]
> (v) The child's relationship with siblings and with other significant adults.

RCW 26.09.187(3)(a).

Because *Combs* involved a dissolution trial conducted prior to the effective date of

the relocation act, it applied the parenting plan criteria under RCW 26.09.187 rather than

the more specific relocation factors later enacted under RCW 26.09.520. To the

extent the three factors pointed to in *Combs* do not correspond to those reflected in

RCW 26.09.520 or must be weighed against countervailing considerations, *Combs* has

been abrogated by RCW 26.09.520.

Moreover, the language of the relocation statute undermines Mr. Kim's argument. Rather than articulating a general "best interests of the child" standard, the statute identifies 11 factors that must be considered in a relocation analysis. The Washington Supreme Court has emphasized the importance of the interests of the relocating person, noting that most of the 11 factors refer to the interests and/or circumstances of the relocating parent and that "'the [relocation act] both incorporates and gives substantial weight to the traditional presumption that a fit parent will act in the best interests of . . . the child and the relocating person.'" *Horner*, 151 Wn.2d at 895 (quoting *In re Custody of Osborne*, 119 Wn. App. 133, 144-45, 79 P.3d 465 (2003)). The *Horner* court emphasized that the interests and circumstances of the relocating parent are "[p]articularly important" and that, "[c]ontrary to the trial court's repeated references to the best interests of the child, the standard for relocation decisions is not only the best interests of the child." *Id.* at 894. Instead, "trial courts consider the interests of the child and the relocating person within the context of the competing interests and circumstances required by the [relocation act]." *Id.* at 895.

Here, the trial court evaluated the 11 factors and concluded the detrimental effect of the proposed relocation did not outweigh its benefits. Accordingly, it applied the correct legal standard to the relocation issue.

*Relocation—Best Interests of Children.* Applying the best interests of the child standard, Mr. Kim next argues that "the evidence does not support that it is in the children's best interests to lose both parents' participation during their critical middle and high school years." Appellant's Br. at 32. He contends that the trial court's decision permitting relocation disregarded the harm caused by severing the children from their father and extended family support system, their school programs, friends, and extracurricular activities. He also points out that Ms. Kim's work schedule will preclude her from giving the children full-time attention and keeping them engaged in their extracurricular activities.

Mr. Kim's argument underscores his misunderstanding of the relocation act. He overlooks the statutory presumption that a proposed relocation will benefit the child and, therefore, will be granted. *Horner*, 151 Wn.2d at 895. By focusing on the best interests of the children, Mr. Kim ignores the importance of the relocating parent's interests and circumstances in the balance. *Id.* Thus, he limits his analysis to evidence of how the children may be harmed by a move, but ignores the benefits to Ms. Kim and the children.

A trial court's decision to permit relocation is necessarily subjective. *In re Marriage of Grisgby*, 112 Wn. App. 1, 14, 57 P.3d 1166 (2002). Our task on review is limited to determining whether the court's findings are supported by the record and whether they, in turn, reflect consideration of the appropriate factors. *Horner*, 151 Wn.2d at 896. We do not reweigh the evidence. *In re Marriage of Kovacs*, 121 Wn.2d 795, 810, 854 P.2d 629 (1993).

We uphold trial court findings if they are supported by substantial evidence. *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993). "'Substantial evidence' exists if the record contains evidence of a sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re Marriage of Fahey*, 164 Wn. App. 42, 55, 262 P.3d 128 (2011).

The trial court here entered findings of fact for each of the 11 factors listed in the relocation statute. Mr. Kim assigns error to all of the court's findings of fact in the court's oral decision "to the extent they provided for relocation and denied shared parenting." Appellant's Br. at 4. However, Mr. Kim does not offer argument on all the assignments of error. We will not review assignments of error not supported by legal argument. *Herring v. Dep't of Soc. & Health Servs.*, 81 Wn. App. 1, 13, 914 P.2d 67 (1996).

13

The first relocation factor requires the court to consider "[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1). Here, the court found that Ms. Kim "clearly has the stronger relationship with the children." CP at 188.

Mr. Kim assigns error to related findings of fact 11 through 15, and 18 and 20, but does not seriously dispute them. These findings stated that the mother tended to the daily needs of the children in their day-to-day care, the mother did not neglect E.K.'s mental health issues, the mother provided the bulk of the parenting functions in the past, the father's past exercise of parenting functions was more limited due to his career, the mother was more involved in the emotional needs of her children, the father's work schedule would have made it difficult for him to have been the primary residential parent, and the mother had the stronger relationship with the children.

Mr. Kim does not explain how these findings are deficient. In fact, in his brief he admits that he worked long hours while Ms. Kim was "home-based" and "more emotionally supportive." Appellant's Br. at 10. Ms. Kim's testimony, detailed above, sufficiently supports these findings. Moreover, the unchallenged findings of fact relating to the initial residential placement issue, state that the mother was the primary caretaker

14

for the children and attended to all their physical and emotional needs; the father was the primary wage earner; the mother managed the day-to-day affairs of the children; the children demonstrated a stronger attachment to the mother; that E.K. is estranged from his father; and that the father works many hours, but does focus on the academic achievements of the children. The court's findings are easily supported by the record, and the court's unchallenged findings are verities on appeal.

Mr. Kim next challenges the court's finding regarding the third relocation factor. This factor requires that the court consider "[w]hether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation." RCW 26.09.520(3). The court found that "disrupting contact between the children and their mother would be more detrimental than disrupting contact between the children and their father." CP at 178.

Mr. Kim contends the court improperly gave preference to Ms. Kim because of her position as the primary residential parent. He argues the trial court may not draw a presumption from a temporary parenting plan when entering a permanent parenting plan, and that the court effectively zeroed out Mr. Kim's role based on what it deemed the mother's success in being more comforting to the children during the stressful time of

separation. However, Mr. Kim fails to show us how the court's ruling favored one parent over another.

The fifth relocation factor requires that the court consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation." RCW 26.09.520(5). In its oral ruling, the court found that Ms. Kim was going to need retraining after being out of her profession for 16 to 17 years. It also noted that the UCLA job offer "provides financial resources for the family and for herself and a career for her." CP at 196. Additionally, the court observed that relocation was consistent with the family's history of relocating many times for Mr. Kim's employment related issues: "In the past it was relocating for—to accommodate husband's career, father's career, and it is now an effort by her to get her career back on track. The alternative would be to require her to [stay] in Yakima where she has no employment opportunities." CP at 197.

Mr. Kim assigns error to the court's following findings of fact related to this issue:

27. The court finds that as mother is not licensed to practice medicine in Washington, and is in need of retraining and has a job offer in southern California, where she is licensed that will provide for her financially that the relocation is not in bad faith.
28. The court further finds that there is no certainty of the mother finding employment in Washington.
29. The court finds that the father's opposition to relocation is made in good faith.

16

30. The court finds that the best place for mother to pursue employment is in southern California.

CP at 178.

Mr. Kim contends that Ms. Kim did not make sufficient efforts to pursue her career in Washington and points out that she never attempted to obtain a Washington license, even though a California medical license has reciprocity in Washington.

The record undermines Mr. Kim's contention. In her affidavit to support her motion to relocate, Ms. Kim explained that UCLA had unexpectedly offered her a surgical pathology fellowship after one of the chosen residents chose to withdraw. She explained that because she had been out of the work force for 14 years, she needed to update her skills. She also stated that she had no option to resume her practice in Yakima or Washington State:

> I am not eligible for a medical license here because I have not worked for over two years. I would need to spend one year in an accredited training program; the only one in Washington is at the University of Washington. . . . [T]he U.W. Pathology Department's Academic Programs Manager informed me that only one or two surgical pathology fellowship positions are available to non-U.W. residents per year. About thirty applicants are considered. They are currently filled for July 2011 and July 2012. Furthermore, the likelihood that I would be accepted at a pathology department of U.W.'s caliber, I would say, is nil.

CP at 63.

17

This evidence provides ample support for the court's finding that Ms. Kim had valid reasons for moving and was not seeking to relocate in bad faith. The trial court was entitled to accept Ms. Kim's testimony as more credible than Mr. Kim's.

The sixth relocation factor requires the court to consider "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child." RCW 26.09.520(6). The court found the children were "very well adapted, very mature." CP at 197. It stated, "I think any damage created by relocating, any uncertainties they're going to have are going to be easily resolved by their various—their respective personalities. I think . . . all three of the kids are going to be able to handle it." CP at 197.

Mr. Kim challenges the following findings of fact related to this factor:

> 22. The court further finds that the children will adapt to the relocation.
>     . . . .
> 31. The court finds that given the age of the children and their developmental stage, relocation would be tolerated by the children and will not have any negative impact on the children.
> 32. The court does not find that the physical, educational, and emotional development of the children will be impaired by relocation.

CP at 178-79.

Mr. Kim contends these findings are contradicted by the GAL's and forensic psychiatrist's opinions that relocation would be detrimental to the children. He also contends that under relocation, the children lose the benefit of a full-time mother, a meaningful relationship with their father and paternal grandparents, their friends, and school programs.

The court addressed the children's attachment to their friends and school and acknowledged that Dr. Adler and the GAL opined that relocation would be potentially detrimental. Nevertheless, the court concluded that the children were adaptable and mature and would be able to adjust to a move. Nothing in the record suggests the children will not be able to adapt to relocation. By all accounts, they are well adjusted and socially engaged. A family friend who testified for Mr. Kim characterized the children as wonderful and the GAL noted the children are "well liked by peers and excel academically." CP at 333. L.K.'s 8th grade teacher reported to the GAL that "'even in the midst of great turmoil, this young man is one who is thought of highly by his peers.'" CP at 334. C.K.'s teacher reported that outwardly she was handling the divorce well and described her as an "'amazing child'" who has "high expectations of herself and works hard to meet them." CP at 334.

Moreover, a trial court is not bound by a GAL's recommendation. *In re Marriage of Magnuson*, 141 Wn. App. 347, 351, 170 P.3d 65 (2007). As noted, the trial court acknowledged the GAL's and psychiatrist's concerns, but believed the children would be able to adapt. Moreover, the court likely found the GAL's opinion of limited usefulness. The GAL concluded that relocation was "not best for the children" and then stated, "[t]he mother would have to demonstrate an overwhelming need" to move. CP at 340. The GAL's opinion ignores the relocation statute's presumption that a proposed relocation will benefit the child and, therefore, the parent proposing relocation need only offer her reasons for relocating. RCW 26.09.520. Ms. Kim was under no obligation to prove an "overwhelming" basis for the move. And finally, Dr. Adler's opinion is limited in that his forensic evaluation was focused on E.K.'s issues and offered no analysis of the issues potentially facing the younger children.

The court addressed the appropriate factors required by the relocation statute. The challenged findings are supported by sufficient evidence and those findings in turn support the court's decision to allow relocation.

*Cultural Factors.* Mr. Kim next asserts that the trial court erred in disregarding cultural factors. He maintains that his strict parenting style and emphasis on the children's education is explained by his Korean heritage and that the differences between

20

the parenting styles of each parent are explained by the differences between the Korean and Japanese approaches to child raising and education.

RCW 26.09.184(3) provides: "In establishing a permanent parenting plan, the court may consider the cultural heritage and religious beliefs of a child." Here, the court's finding of fact 1 provided, "The court considered testimony regarding the Asian culture as it applied to the parenting of the parties['] minor children and ha[s] determined that cultural considerations are inapplicable in deciding residential provisions for these children." CP at 177.

In its oral decision, the court stated:

> I think what we have here is a husband from New Jersey and a wife from Southern California, and I can no more balance these two states than I can Korea and Japan. What I think we're left with is, frankly, Washington residents and Washington children, and that's the way I've analyzed it.

CP at 184.

The word "may" in a statute denotes discretion and is distinct from the word "shall," which indicates a mandatory action. *Pierce v. Yakima County*, 161 Wn. App. 791, 800-01, 251 P.3d 270 (2011). Because the legislature used the word, "may" in RCW 26.09.184(3), the court was not required to take the parties' cultural heritages into consideration. Mr. Kim contends that the court failed to realize the importance of the role of an Asian father and "how the children needed regular, daily contact for the purposes of

21

discipline, accountability, role-modeling, and character development." Appellant's Br. at 37. Both the GAL and Dr. Adler talked about the importance of the cultural and family factors in this case, but did not really explain how these observations were relevant to the relocation decision. For example, the GAL noted that the dominant value of Korean culture is to go as high as possible in education. Dr. Adler reported that E.K.'s problems needed to be understood in the context of having a first generation Korean father and a third generation Japanese mother, explaining that children of immigrants are inherently at risk of feeling alienated from their parents. However, Mr. Kim fails to explain how this information relates to the relocation issue. While it may have been helpful in E.K.'s treatment plan, it had little relevance to the relocation decision before the court. Nevertheless, the court considered the information before making a decision to disregard it for purposes of the relocation decision. The court did not abuse its discretion in doing so.

*Property Division.* Next, Mr. Kim contends the property division was unfair because the trial court failed to compensate him for supporting Ms. Kim through medical school. Relying on *In re Marriage of Washburn*, 101 Wn.2d 168, 677 P.2d 152 (1984), he contends that our Supreme Court "established a clear rule that requires compensation in the property division for a spouse who supports the other spouse in obtaining a

22

lucrative professional degree where the marriage ends before that degree contributes to that community." Appellant's Br. at 41-42.

The court addressed Mr. Kim's request for compensation based on his support of Ms. Kim through medical school as follows:

> [Ms. Kim's] decision, her desire not to pursue a career is a reason why you may have wanted to get a divorce 17 years ago, but the fact is . . . that both of you followed, the fact that she . . . chose motherhood over career is not something that is entitled to compensation and I think that's a very critical part of this. The fact that you have a substantial income and she doesn't is important. . . . You have a greater financial ability and you would not be entitled to compensation and I can't imagine any judge ever granting that kind of compensation that you asked.

CP at 203.

*Washburn* does not help Mr. Kim. In that case, the court addressed the situation where one spouse supports the other through professional school, but the marriage is dissolved before any financial benefit from that investment is realized. *Washburn*, 101 Wn.2d at 170. The court noted that "the supporting spouse may be called upon to postpone his or her own education or forego promotions and other valuable career opportunities in order to find a job near the student spouse's school." *Id.* at 173. The court further noted that at divorce, the parties often have little or no assets to divide, so maintenance is appropriate, especially if the marriage ended soon after the student spouse finished school. *Id.* at 181.

23

Our facts bear little resemblance to *Washburn.* In that case, the marriage ended about two years after the student spouse finished an internship. There were almost no assets at the time of divorce. In contrast, this case involves a long-term marriage of almost 25 years and the accumulation of significant assets during those years. Additionally, Ms. Kim's parents, not Mr. Kim, paid for her medical school education. Moreover, Mr. Kim fails to acknowledge that Ms. Kim's labor as a full-time parent to the children and as a homemaker allowed Mr. Kim to vigorously pursue his career at the expense of hers. Unlike the situation in *Washburn,* Mr. Kim did not forego career opportunities to support Ms. Kim. In fact, the record establishes the opposite. The family frequently moved to accommodate Mr. Kim's career and it was Ms. Kim's sacrifices that enabled Mr. Kim to put in long work hours and achieve success in his career. Under these facts, the trial court did not abuse its discretion in disregarding Mr. Kim's request for compensation for supporting Ms. Kim through medical school.

Mr. Kim further argues that the 60 percent/40 percent property division is unjust in view of the facts that (1) Mr. Kim supported Ms. Kim through medical school, (2) Ms. Kim is six years younger than Mr. Kim and therefore has more years to work, and (3) Ms. Kim unilaterally chose not to work over Mr. Kim's objections.

In reaching a "just and equitable" property division, the trial court must consider four statutory factors: (1) the nature and extent of the community property, (2) the nature and extent of the separate property, (3) the duration of the marriage, and (4) the economic circumstances of each spouse at the time the property division is to become effective. RCW 26.09.080; *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007). The trial court has broad discretion in distributing marital property, and its decision will be reversed only if there is a manifest abuse of discretion. *Rockwell*, 141 Wn. App. at 242-43. If the decree results in a patent disparity in the parties' economic circumstances, a manifest abuse of discretion has occurred. *Id.* at 243.

"In a long term marriage of 25 years or more, the trial court's objective is to place the parties in roughly equal financial positions for the rest of their lives." *Id.* In view of the length of the marriage, Ms. Kim's absence from the work force for 16 to 17 years, the uncertainties of relocation, and the substantial difference in the parties' relative earning capacities, the court's property division was equitable. The record reflects that Mr. Kim earns between $250,000 and $322,000 per year, while Ms. Kim will be earning $60,000 to $70,000 per year in her fellowship. Mr. Kim's argument ignores the fact that Ms. Kim will be in her late 40s by the time she has finished her training and will have significantly fewer years in the paid work force than Mr. Kim. Under these facts, the court did not

abuse its discretion in awarding Ms. Kim a larger percentage of the community's property.

Finally, Mr. Kim contends that the trial court erred in treating the $100,000 from his parents as a gift, rather than a loan. He argues that a gift requires donative intent and that both his parents testified that the money was a loan, not a gift. In characterizing the sum as a gift, the court noted, "There are no terms regarding repayment. . . . [T]here is a clear and definitive statement that it is a gift." CP at 205.

The record undermines Mr. Kim's claim. Exhibit 14 is a written document entitled "GIFT LETTER" and provides: "This letter will certify that [Mr. Kim's parents] are making a gift in the amount of $100,000 to assist our . . . son and daughter-in-law to purchase the property located at 3170 Naches Heights Rd., Yakima, WA." The letter also provided that "[t]here is no obligation that this gift be repaid in any form either by cash or by work performed." Ex. 14. In view of this evidence, the trial court did not abuse its discretion in characterizing the $100,000 as a gift.

The court's property division was equitable.

*Child Support.* Child support orders are reviewed for an abuse of discretion. *In re Marriage of Griffin*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990).

Child support is determined by state-determined support schedules calculated on worksheets developed by the administrative office for the courts. RCW 26.19.035; *see In re Marriage of Sievers*, 78 Wn. App. 287, 305, 897 P.2d 388 (1995). The purpose of the schedule is to ensure support orders that meet children's basic needs and provide additional support commensurate with the parents' incomes and resources, and that equitably apportion the support among the parents. RCW 26.19.001.

Mr. Kim contends that the child support order should be vacated because the trial court failed to include maintenance as income to the mother and a deduction to the father in the child support worksheet. He contends the difference in his child support obligation of 65.8 percent versus 77.6 percent results in an inequitable apportionment of child expenses.

During presentment of the final documents on January 25, 2013, Mr. Kim suggested that the child support worksheets include maintenance as a deduction for Mr. Kim and an increase in income for Ms. Kim. The trial court responded:

> I don't think it's appropriate to deduct [maintenance] because what I'm going to end up doing is if it changes the numbers, I am going to increase the maintenance to make it come out. So, you either go with the numbers I've got or we kind of get into this circular argument with no particular end. [I]f I deduct maintenance, child support will go down, then that will change the total amount, so I'm going to increase it again. It being the maintenance, so I think it's appropriate just to leave it off.

RP (Jan. 25, 2013) at 40-41.

During the September 13, 2012 hearing, the trial court imputed Ms. Kim's income at the level she would be earning in California, $5,700, noting the difference between her child support and need would be made up in spousal maintenance. The trial court did not abuse its discretion in doing so. The court considered both maintenance and child support, and considered the needs of Ms. Kim and the family before and after moving to California. Mr. Kim fails to show how the court's calculation resulted in an inequitable apportionment of child support to him.

The trial court did not abuse its discretion in calculating child support.

*Attorney Fees.* Ms. Kim requests attorney fees on appeal under RCW 26.09.140 and RAP 18.1(a) and (b). She points out that her income is substantially less than Mr. Kim's and that she should not be required to deplete the assets she was awarded in this dissolution to defend an appeal without merit.

RCW 26.09.140 gives this court discretion to "order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." In exercising our discretion, we consider the issues' arguable merit on appeal and the parties' financial resources, balancing the financial need of the requesting party against the other party's ability to pay. *In re Marriage of*

*C.M.C.*, 87 Wn. App. 84, 89, 940 P.2d 669 (1997).

## CONCLUSION

We affirm the trial court, and we award attorney fees on appeal to Ms. Kim.

_____
Kulik, J.

WE CONCUR:

_____
Korsmo, C.J.

_____
Siddoway, J.