FILED
COURT OF APPEALS
DIVISION II

2015 JUN 16 AM 8: 30

STATE OF WASHINGTON
BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Marriage of: | No. 45767-9-II |
| ANTONIO JOSE CARRASCO, | |
| Appellant/Cross Respondent, | |
| and | |
| | UNPUBLISHED OPINION |
| ANNA MARIE CARRASCO, | |
| Respondent/Cross Appellant. | |

WORSWICK, J. — Antonio Carrasco appeals the trial court's maintenance award and

division of property in this marital dissolution case. He argues that the trial court abused its

discretion by (1) failing to impute income to his ex-wife, Anna Tarantino, for purposes of

calculating spousal maintenance and child support, (2) awarding Tarantino "supplemental"

maintenance, (3) securing Tarantino's maintenance payments with a life insurance policy, (4)

ordering Carrasco to pay all expenses for his adult daughter's treatment for an eating disorder,

and (5) using the trial date to calculate Tarantino's share of Carrasco's retirement account. We

affirm and we grant attorney fees to Tarantino.

## FACTS

Antonio Carrasco and Anna Tarantino were married for 19 years. When the couple

married in January of 1994, Tarantino was working as a secretary and Carrasco was an

undergraduate student. After Carrasco's graduation in 1996, the couple moved from California

to Minnesota, where Carrasco studied for a PhD and then a medical degree from 1996 until 2006.

The couple then moved to Wisconsin, where Carrasco was a medical resident from 2006 until 2008. In 2008, the couple moved to Vancouver, Washington, where Carrasco completed another medical residency from 2008 until 2010. From 2010 to 2012, Carrasco remained as a fellow at the hospital where he had completed his residency. In 2012, Carrasco obtained full employment as a doctor at the same hospital. Carrasco was earning roughly $16,210.10 in gross monthly income at the time of dissolution.

In 1994, shortly after the couple's marriage, Tarantino quit her job to raise the couple's first child. The couple had three children: Sarah,[1] born in 1994; and two teenaged boys, born in 1999 and 2000. Tarantino took care of their children full-time. Thus, from 1994 until 2012 the couple and their children lived primarily on Carrasco's student loans, grants, stipends, and financial aid. During the marriage, the couple acquired few assets: they had owned a house in Minnesota, but it was foreclosed upon. At the time of dissolution, they owned a house in Vancouver.

Carrasco moved out of the family home on August 18, 2012, and filed for divorce shortly thereafter. The parties proceeded to trial on October 28 and 29, 2013. Both Carrasco and Tarantino testified at trial.

During Carrasco's opening statement, his attorney spoke about the couple's adult daughter, Sarah, and her need for treatment for an eating disorder. The attorney said, "[Y]ou will hear testimony that my client has had regular and on-going contact with [Sarah] and that he has provided for all of her medical needs, all of her billings and he is actually the one that's going to

---

[1] The record is inconsistent regarding the spelling of Sarah's name.

be paying for her in-patient treatments." Verbatim Report of Proceedings (VRP) at 4. During

Tarantino's opening statement, the following colloquy took place:

> [Tarantino's attorney]: I am thrilled this morning to hear for the first time that the husband is willing to pay for [Sarah]'s treatment program. That is the first that we've heard of that. . . . And I'm hearing that it is a stipulation that the husband will pay for the—
> [Carrasco's attorney]: Yes.
> [Tarantino's attorney]:—treatment program.
> [Carrasco's attorney]: It's already—he's sent her money for her plane ticket and—
> [Judge]: So your client is stipulating that he will pay for *all* treatment costs?
> [Carrasco's attorney]:—yes.
> [Tarantino's attorney]: Fabulous. Thank you.
> [Judge]: Okay. So noted on the record then.

VRP at 12-13 (emphasis added). The topic of Carrasco paying for Sarah's treatment arose

several times during trial, and each time, Carrasco affirmed that he would pay for it. On direct

examination of Carrasco, his attorney engaged him in the following questioning:

> Q: And who arranged to pay for the treatment that she's received?
> A: For the treatment that she's received?
> Q: Thus far?
> A: I pay for that.

VRP at 21. Later, in the same direct examination, Carrasco's attorney reminded him that he

hadn't added the cost of Sarah's treatment to the worksheet about each spouse's costs:

> Q: But you didn't include the—the cost of sending [Sarah] to treatment, did you?
> A: No I did not.
> Q: Okay. So that would be in addition to these premiums, correct?
> A: Correct.

VRP at 78. His attorney also questioned him about the costs of Sarah's treatment:

> Q: Do you—do you know how much you have spent on [Sarah]'s treatment to date?
> A: No I do not.

Q: And you could—
A: It's in the thousands.
Q: —give an estimate for the court?
A: Approximately twenty to twenty-five thousand dollars.
Q: And do you know how much it's going to cost for her to go through the in-patient treatment program?
A: I imagine it will be a similar amount—fifteen to twenty thousand dollars.
Q: And you've already stipulated to the court that you're going to undertake this step?
A: Yes.

VRP at 24-25. Later, Tarantino testified that she believed the treatment would cost about $10,000 per year.

On cross-examination, Tarantino's attorney discussed treatment costs with Carrasco:

Q: You've indicated that you will pay for [Sarah]'s treatment program?
A: Correct.
Q: Yeah.
A: I've been paying for [Sarah]'s medical care.

VRP at 106.

Tarantino testified that since the separation she had attempted to reenter the workforce: she had performed volunteer work after hearing that it was a good way to improve job prospects, and she had investigated job placement services. She had attempted secretarial work, but did not find it promising as a career, so she began volunteering to learn medical billing.

After trial, the court entered findings of fact and conclusions of law. The trial court found a disparity between the parties' educations and future earning prospects. Accordingly, the decree of dissolution provided for spousal maintenance to Tarantino of $5,500 per month for a total of nine years, representing a five year base plus an additional four years to allow Tarantino the time to seek higher education. The trial court did not impute any income to Tarantino in

calculating maintenance. The trial court ordered Carrasco to name Tarantino as a beneficiary on his life insurance policy in an amount at least equal to the remaining maintenance payments to secure these payments in the event of Carrasco's early death.

The trial court also divided the couple's property. It found that the couple had separate property listed on exhibits attached to the decree of dissolution. The trial court allocated half of Carrasco's retirement account accrued through October 29, 2013 (the date of trial) to each spouse as their separate property. The court awarded the Vancouver house to Carrasco and half of the house's equity to Tarantino.

The trial court entered a final parenting plan and child support order. The child support order did not mention the couple's adult daughter Sarah. The child support order established payments for their two sons based on an attached worksheet, which showed that Tarantino had no income apart from spousal maintenance.

About a month after the judgment, Carrasco moved to enforce certain terms of the decree. In response, Tarantino requested an addendum to the decree, claiming that, despite Carrasco's stipulation to pay the costs of Sarah's treatment, he had since told Sarah he would not pay for anything. After a hearing to resolve the dispute, the trial court entered an addendum to the decree of dissolution which included a supplemental finding of fact stating that "the parties entered a CR2A Stipulation and placed on the record that the husband has stipulated to paying all expenses related to the adult child Sarah's medical and mental health treatment related to her eating disorder. Thus, this Stipulation shall become a part of this Addendum to Decree and Final Order." Clerk's Papers (CP) at 169. Carrasco appeals.

ANALYSIS

I. STANDARD OF REVIEW

Carrasco bears a substantial burden in appealing the trial court's dissolution decree. We favor finality in dissolution actions. *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985). To prevail, Carrasco must show a manifest abuse of discretion by the trial court. 103 Wn.2d at 809.

Unchallenged findings are verities on appeal. *In re Marriage of Kim*, 179 Wn. App. 232, 246, 317 P.3d 555, *review denied*, 180 Wn.2d 1012 (2014). We review de novo whether the trial court's conclusions of law flow from its findings of fact. *In re Marriage of McDermott*, 175 Wn. App. 467, 483, 307 P.3d 717, *review denied*, 179 Wn.2d 1004 (2013). We defer to the trial court on issues of conflicting testimony and witness credibility. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002).

II. FINDINGS OF FACT

Carrasco assigns error to findings of fact 2.8, 2.12, and 2.20. Because Carrasco does not argue that these findings lack substantial evidence, we consider them verities. *See* RAP 10.3(a)(6); *Hoskins v. Reich*, 142 Wn. App. 557, 565 n. 5, 174 P.3d 1250 (2008).

Finding of fact 2.8 states that the couple has "real or personal property set forth in Exhibit 'H' and 'W.'" CP at 111. Carrasco does not argue that this finding lacks substantial evidence, because he does not contest that the couple has such property. Instead, he contests the trial court's division of his retirement account. We address that legal argument below, but consider finding of fact 2.8 a verity.

Finding of fact 2.12 says that Tarantino does not have outside resources, and Carrasco could afford to pay spousal maintenance and child support; that the marriage was of significant length but produced only nominal community property due to the couple's focus on Carrasco's education; and that Tarantino had only a high school education and it was unlikely she would ever match Carrasco's earning potential given her age at 46 and her limited time to pursue a career. Carrasco does not argue that any of these facts lack substantial evidence. Thus, we consider this finding as a verity on appeal.

Finding of fact 2.12 goes on to state that spousal maintenance was appropriate for sufficient time to allow Tarantino to seek, at minimum, a four-year degree, and that nine total years of spousal maintenance was appropriate and equitable. These rulings are conclusions of law labeled as findings of fact, so we review them de novo as conclusions of law. *Casterline v. Roberts*, 168 Wn. App. 376, 383, 284 P.3d 743 (2012). We address Carrasco's challenges to those legal conclusions below.

Finding of fact 2.20 states: "There are children in need of support and child support should be set pursuant to the Washington State Child Support Schedule," and finds that the child support order is incorporated by reference into the decree of dissolution. CP at 113-14. Carrasco does not argue that any of these facts lack substantial evidence, but instead contests the trial court's order that Carrasco pay for his adult daughter's eating disorder. We consider this finding as a verity, and address his legal argument below.

### III. MAINTENANCE AWARD

A.    *No Imputed Income*

Carrasco argues that the trial court abused its discretion by failing to impute a minimum wage income to Tarantino for purposes of calculating both her spousal maintenance award and Carrasco's child support obligations. We disagree.

Carrasco challenges both the trial court's determination of Tarantino's need for maintenance, and its calculation of child support based the maintenance award. Spousal maintenance and child support are governed by separate statutes (chapter 26.09 RCW and chapter 26.19 RCW, respectively) and require separate legal analyses.

1. *Calculating Maintenance*

Carrasco argues that the trial court erred by not imputing income to Tarantino before calculating maintenance. We disagree.

In marriage dissolution proceedings, a trial court "may grant a maintenance order for either spouse." RCW 26.09.090. The trial court has great discretion in awarding maintenance: the maintenance order "shall be in such amounts and for such periods of time *as the court deems just*, without regard to misconduct, after considering *all relevant factors*."[2] RCW 26.09.090

---

[2] These factors include but are not limited to:

> (a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

(emphasis added). "The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just." *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990).

The trial court concluded that nine years of spousal maintenance was appropriate because Tarantino's future earning capacity was significantly lower than Carrasco's, due to the many years the couple spent supporting Carrasco's education. This legal conclusion flows from the trial court's findings of fact. The court found that Tarantino did not have outside financial resources, and needed time to earn a degree. By contrast, the court found that Carrasco had the ability to provide for his own needs even if ordered to pay maintenance and child support. It also found that the community had nominal property because the primary focus was Carrasco's education and medical degree, and that Tarantino's earnings were unlikely to match Carrasco's. The court's conclusion that nine years of maintenance was appropriate flows from these unchallenged findings.

The statute provides broad discretion for the trial court to award maintenance in such a way as it finds just, considering all relevant factors but not bound to any strict statutory formula. RCW 26.09.090; *see Bulicek*, 59 Wn. App. at 633. Here, the trial court balanced the couple's

---

        (c) The standard of living established during the marriage or domestic partnership;
        (d) The duration of the marriage or domestic partnership;
        (e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and
        (f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.
RCW 26.09.090(1).

relative earning potential and financial resources based on the undisputed facts that Carrasco had a medical degree and Tarantino had almost no training or work experience. Carrasco has not carried his burden of showing that the trial court abused its discretion by ordering an unjust maintenance award.

### 2. *Calculating Child Support*

Carrasco argues that the trial court erred by not imputing income to Tarantino for the purposes of calculating child support. He argues that the trial court should have found that Tarantino was voluntarily unemployed, and then should have imputed a minimum wage income to her for purposes of calculating child support. We disagree.

Trial courts must consider all sources of both parents' income when calculating child support. RCW 26.19.071(1). The trial court is obligated to impute income when it finds that a spouse is voluntarily unemployed. RCW 26.19.071(6). "Voluntary unemployment" is "unemployment that is brought about by one's own free choice and is intentional rather than accidental." *In re Marriage of Brockopp*, 78 Wn. App. 441, 446 n. 5, 898 P.2d 849 (1995).

The trial court did not manifestly abuse its discretion by finding that Tarantino was not voluntarily unemployed. Tarantino testified that she had made attempts since the separation to reenter the workforce: she had performed volunteer work after hearing that it was a good way to improve job prospects, and she had been investigating placement services. She attempted secretarial work, but did not find it promising as a career, so she began volunteering to learn medical billing. Thus, the evidence provided tenable grounds for the trial court's ruling that

Tarantino was not intentionally unemployed.[3] The trial court did not manifestly abuse its discretion by not finding that Tarantino was voluntarily unemployed. Thus, the trial court did not err by not imputing income to Tarantino for purposes of calculating child support.

B.      *Supplemental Maintenance for Unrealized Educational Benefit*

The trial court awarded Tarantino maintenance for nine years. Carrasco argues that the trial court abused its discretion by awarding Tarantino maintenance for four of those years, which compensated her for the unrealized benefits of Carrasco's education. He argues that (1) Tarantino did not prove that she supported Carrasco through medical school and thus the trial court abused its discretion by compensating her, and (2) maintenance should be limited to the number of years Tarantino needs to receive an education. We disagree.

The only limitation on amount and duration of maintenance under RCW 26.09.090 is that, in light of the relevant factors, the award must be just. *In re Marriage of Washburn*, 101 Wn.2d 168, 178, 677 P.2d 152 (1984). One such relevant factor is whether one spouse supported another in obtaining a professional degree in anticipation of benefiting the marital community, but the marriage ended before those benefits could be realized. *Washburn*, 101 Wash.2d at 178. There is no precise formula for awarding maintenance; instead, maintenance is a "flexible tool" a

---

[3] Carrasco urges us to hold that Tarantino admitted she was voluntarily unemployed, stating on cross-examination that she "choose[s] not to work right now." Br. of Appellant at 14. But we do not disturb findings supported by substantial evidence even where conflicting evidence exists. *Burrill*, 113 Wn. App. at 868. Tarantino said she chose not to work in the context of Carrasco's attorney cross-examining her about her daily schedule, urging her to admit it would be possible to maintain a part-time job. But Tarantino said she was not actively seeking work in Vancouver due to her plans to move to California once the divorce was settled. We will not disturb the trial court's decision due to one statement from Tarantino, taken out of context.

11

court may use to equalize the parties' standard of living. *Washburn*, 101 Wn.2d at 179. When awarding maintenance where there are unrealized educational benefits, a trial court must consider four factors: (1) the amount of community funds expended for educational costs, (2) the income the community would have earned had the student spouse worked rather than gone to school, (3) the nonstudent spouse's lost educational or career opportunities given up due to the student spouse's education, and (4) each spouse's future earnings prospects. *Washburn*, 101 Wn.2d at 179-80.

Carrasco argues that the trial court abused its discretion by compensating Tarantino for more than the amount Tarantino paid for Carrasco's education, and for more than the amount of time Tarantino required to obtain an education. But our law does not require a trial court to award supplemental maintenance to reimburse the supporting spouse for *past* separate expenditures (e.g., actually paying for the other spouse's education); instead, it reimburses the supporting spouse for *expected future* benefits from the educated spouse's increased earning potential that had not yet come to fruition at dissolution. *See Washburn*, 101 Wn.2d at 179-80; *Kim*, 179 Wn. App. at 252-53; *In re Marriage of Fernau*, 39 Wn. App. 695, 703-05, 694 P.2d 1092 (1984). Moreover, there is no rigid formula for awarding maintenance. *Washburn*, 101 Wn.2d at 179. There is no basis in our law for limiting a trial court's award of maintenance to the amount a supporting spouse paid toward a student spouse's education, nor to the number of years that the spouse requires to obtain an education.

Here, the trial court did not manifestly abuse its discretion in providing supplemental maintenance. The court found a major disparity between the couple's finances: Carrasco's

monthly gross wage was roughly $16,000, whereas Tarantino had no income apart from spousal maintenance. It found that Tarantino had not worked during the marriage, and that the couple's total finances were "nominal" because of the long time Carrasco spent obtaining his degrees. CP at 112. It found that Tarantino's future job prospects were limited due to her age and lack of experience. These findings are verities, and these considerations are proper under *Washburn*. 101 Wn.2d at 179-80.

In addition to the *Washburn* factors, the trial court considered all relevant factors under RCW 26.09.090. As described above, the trial court considered the couple's relative earning potential, current financial situation and income, length of marriage, and child support obligations. Even if Tarantino were able to support herself fully in a new career, as Carrasco argues, this factor would not be dispositive. Rather, the age, health, and employability of the spouse seeking maintenance is but one factor for the trial court to consider in awarding maintenance. RCW 26.09.090(1)(e); *Washburn*, 101 Wash.2d at 178-79. We hold that the trial court did not manifestly abuse its discretion in the amount and duration of spousal maintenance it awarded Tarantino. Its conclusions flow from its findings of fact about the couple's focus on Carrasco's education, and the court fairly considered the factors of RCW 26.09.090 and *Washburn*. We hold that the trial court made a just and equitable award in light of those factors.[4]

---

[4] Carrasco argues briefly in his issues pertaining to assignments of error that the trial court should have ordered that the start date of maintenance was when payments began. He does not provide argument about this issue, so we do not address it. *See Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

13

C. *Securing Maintenance Payments through Life Insurance*

Carrasco argues that the trial court abused its discretion by ordering him to maintain a life insurance policy to secure maintenance payments to Tarantino. He argues that this was an abuse of discretion because it creates a windfall for Tarantino in two ways. We disagree.

First, Carrasco argues that the order requiring him to secure his maintenance payments to Tarantino through his life insurance policy is an abuse of discretion because, were Carrasco to die before maintenance payments had ceased, Tarantino would receive a lump sum through the life insurance benefit that would accrue interest over time if she invested it, resulting in a much larger payout than incremental maintenance payments. Second, Carrasco argues that the order creates a windfall because Tarantino would not owe taxes on the proceeds of Carrasco's life insurance policy, but she would owe taxes on her monthly spousal maintenance payments.

There is no requirement that a property division be mathematically precise; instead, it must be just and equitable. *In re Marriage of Crosetto*, 82 Wn. App. 545, 556, 918 P.2d 954 (1996). We hold that Carrasco has failed to show that the trial court manifestly abused its discretion or created an unjust or inequitable result by securing Tarantino's maintenance payments with Carrasco's life insurance policy.

## IV. MEDICAL TREATMENT ORDER

Carrasco argues that the trial court erred by ordering Carrasco to pay for Sarah's medical and mental health treatment relating to her eating disorder. He argues that the trial court misconstrued the parties' stipulation: he declares that he agreed to pay only up to "$20,000 for [Sarah's] treatment for bulimia as an in-patient upon her arrival in Vancouver in late October or

early November, 2013." Br. of Appellant at 29. He argues that the trial court's order, which included no cost ceiling or time restrictions, exceeded the bounds of the parties' stipulation and must be stricken. We affirm the order, because the trial court properly entered this order pursuant to the parties' stipulation.

CR 2A provides:

No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.

"CR 2A applies only when (1) the agreement was made by the parties or attorneys 'in respect to the proceedings in a cause[,]' and (2) the purport of the agreement is disputed." *Patterson v. Taylor*, 93 Wn. App. 579, 582, 969 P.2d 1106 (1999) (quoting *In re Marriage of Ferree*, 71 Wn. App. 35, 39, 856 P.2d 706 (1993)). CR 2A applies here because the agreement at issue was a stipulation made on the record in open court, and Carrasco disputes the substance of the stipulation.

A stipulation made in open court is a binding contract. *Cook v. Vennigerholz*, 44 Wn.2d 612, 615, 269 P.2d 824 (1954). The trial court's function is "to ascertain that the parties and counsel understand the stipulation and to implement that agreement." *Baird v. Baird*, 6 Wn. App. 587, 589-90, 494 P.2d 1387 (1972) (citation omitted). We do not look behind the face of the stipulation on the record unless the party contesting it shows that it was the product of fraud, mistake, lack of jurisdiction, or attorney overreach. *Washington Asphalt Co. v. Harold Kaeser*

*Co.*, 51 Wn.2d 89, 91, 316 P.2d 126 (1957); *Nguyen v. Sacred Heart Med. Ctr.*, 97 Wn. App. 728, 735, 987 P.2d 634 (1999); *Baird*, 6 Wn. App. at 589-90.

Here, the trial court found "that the parties entered a CR2A Stipulation and placed on the record that the husband has stipulated to paying all expenses related to the adult child Sarah's medical and mental health treatment related to her eating disorder." CP at 169. This finding was based on the following colloquy:

> [Judge to Carrasco's attorney]: So your client is stipulating that he will pay for *all* treatment costs?
> [Carrasco's attorney]:—yes.
> [Tarantino's attorney]: Fabulous. Thank you.
> [Judge]: Okay. So noted on the record then.

VRP at 13 (emphasis added). Carrasco now claims that his stipulation was limited to paying for $20,000, based on a response he gave on direct examination when responding to his attorney's question about how much treatment might cost.[5] Carrasco estimated treatment would cost about "fifteen to twenty thousand dollars." VRP at 24. He verified that he was "going to undertake this step." VRP at 24-25. But we do not look behind the face of a stipulation unless the party contesting the stipulation can show it is the result of fraud, mistake, lack of jurisdiction, or attorney overreach. *Washington Asphalt Co.*, 51 Wn.2d at 91; *Nguyen*, 97 Wn. App. at 735; *Baird*, 6 Wn. App. at 589-90. Carrasco alleges none of these defects. Accordingly, we do not

---

[5] Carrasco argues for the first time in his reply brief that the trial court lacked jurisdiction over Sarah because she was an adult. We do not consider arguments raised for the first time in reply briefs. *In re Marriage of Sacco*, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990).

disturb the trial court's order enforcing the stipulation that Carrasco should pay "*all* treatment costs." VRP at 12-13 (emphasis added).

Carrasco argues that the unlimited order leads to the absurd result that "[i]f, twenty years from now, Sarah submits herself to the care of a faith healer in Switzerland whose cure for Sarah's eating disorder involves joint counseling sessions with Sarah and [Tarantino], the order obligates [Carrasco] to pay for it," and "[t]hat was not what [Carrasco] agreed to." Br. of Appellant at 27. But this challenge is not ripe: Carrasco does not allege that Tarantino has moved to enforce the stipulation in an absurd manner; he argues instead that she might someday do so.

Furthermore, should Tarantino seek in the future to enforce the stipulation in what Carrasco believes is an unreasonable manner, courts in Washington will use the context rule of contract interpretation to help effectuate Carrasco's intent in entering this stipulation. *See Fedway Marketplace W., LLC v. State*, 183 Wn. App. 860, 871, 336 P.3d 615 (2014) *review denied*, 182 Wn.2d 1013 (2015); *Dan's Trucking, Inc. v. Kerr Contractors, Inc.*, 183 Wn. App. 133, 140-41, 332 P.3d 1154 (2014). The context rule allows the court to view a contract, including a stipulation, as a whole and "'consider extrinsic evidence, such as the circumstances leading to the execution of the contract, the subsequent conduct of the parties and the reasonableness of the parties' respective interpretations.'" *Fedway*, 183 Wn. App. at 871 (quoting *Roats v. Blakely Island Maint. Comm'n, Inc.*, 169 Wn. App. 263, 274, 279 P.3d 943 (2012)); *see also Dan's Trucking*, 183 Wn. App. at 140-41. Courts use the context rule even

when interpreting an unambiguous contract term, and the court will use extrinsic evidence only to determine the meaning of words the parties used. *Fedway*, 183 Wn. App. at 871.

Thus, should Tarantino move to enforce the stipulation in an unreasonable manner, the context rule will permit a court to interpret the term that Carrasco will pay "all" of the treatment costs in accordance with Carrasco's demonstrated intent to pay for the reasonable cost of Sarah's anticipated eating disorder treatment needs, which he believed would be roughly $20,000. Furthermore, the context rule would permit the court to reject any potential unreasonable interpretation of the stipulation Tarantino might offer. *Fedway*, 183 Wn. App. at 871. Thus, we hold that Carrasco's argument about potential future abuses of the stipulation is not ripe, and that the context rule will permit a court to interpret the stipulation in accordance with Carrasco's demonstrated intent when enforcing the stipulation in the future.

## V. START DATE OF RETIREMENT BENEFITS

Carrasco argues that the trial court erred by awarding half of Carrasco's retirement account to Tarantino through the trial date, rather than the separation date. He argues that Tarantino has no right to amounts in his retirement account accrued after the couple's separation, because they are his separate property. We disagree.

We review the trial court's allocation of property for a manifest abuse of discretion. *Landry*, 103 Wn.2d at 809-10. In a dissolution proceeding, the trial court "shall, without regard to misconduct, make such disposition of the property and the liabilities of the parties, either community or separate, *as shall appear just and equitable.*" RCW 26.09.080 (emphasis added). The trial court shall consider all relevant factors including, but not limited to:

18

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage or domestic partnership; and
> (4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

RCW 26.09.080. Thus, trial courts have broad discretion in dissolution proceedings to allocate *both* community and separate property in a just and equitable manner, considering "all" relevant factors. RCW 26.09.080. And a party challenging the trial court's decision in a dissolution proceeding must demonstrate that the trial court manifestly abused its discretion. *Landry*, 103 Wn.2d at 809.

By the plain terms of RCW 26.09.080, the characterization of property as community or separate does not control its distribution. *In re Marriage of Konzen*, 103 Wn. 2d 470, 478, 693 P.2d 97 (1985). Instead, the trial court must consider *all* relevant factors, and has the discretion to dispose of property, "either community or separate," so long as the award is just and equitable. RCW 26.09.080. Carrasco has not carried his burden of demonstrating that the trial court manifestly abused its discretion by using the trial date, rather than the date of separation, to calculate Tarantino's share of his retirement account. The trial court considered all relevant factors, only one of which was whether the property was characterized as community or separate. RCW 26.09.080. Carrasco does not argue that this award was not just or equitable. Because the characterization of property as separate does not control its distribution, and because the trial court is obligated to arrive at a just and equitable distribution of property regardless of its characterization, Carrasco fails to show that this award was erroneous.

No. 45767-9-II

## ATTORNEY FEES

Both Carrasco and Tarantino request attorney fees on appeal. RAP 18.1(a) permits us to award attorney fees to a party entitled to them under "applicable law." RCW 26.09.140 allows the appellate court, in its discretion and after considering the "financial resources" of the parties, to order a party to pay the attorney fees of the other party in cases governed by chapter 26.09 RCW. A party must timely file a financial declaration with us for his or her resources to be considered. RAP 18.1(c).

Tarantino filed an affidavit of financial need at least 10 days before oral argument. RAP 18.1(c). Finding that she has the financial need, we grant her attorney fees on appeal, in an amount to be determined by our court commissioner.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Johanson, C.J.

_____
Melnick, J.

20