IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Marriage of | No. 74343-1-I |
| JOHN B. VELEZMORO, | DIVISION ONE |
| Respondent, | |
| and | UNPUBLISHED OPINION |
| KAROLINA N. VELEZMORO, nka KAROLINA MARTYNOVA, | FILED: March 6, 2017 |
| Appellant. | |

BECKER, J. — Appellant Karolina Martynova contends the restrictions on the father's visitation included in the parenting plan for her daughter are insufficient to protect the child, given the father's conviction for possessing child pornography. The visitation allowed by the parenting plan progresses in three phases, allowing for the possibility of unsupervised visits after age six, always in a public place with no overnight visits. We conclude the carefully constructed plan was within the trial court's discretion and affirm.

John Velezmoro and Karolina Martynova met online in 2011. Velezmoro lived in Kirkland, Washington, and Martynova lived in St. Petersburg, Russia. After a few months, Velezmoro purchased a roundtrip airplane ticket for

Martynova to visit the Seattle area for three weeks. Martynova came to Seattle in September 2011. Two weeks after she arrived, Velezmoro and Martynova married. Martynova did not return to Russia. The parties' daughter, M.V., was born on August 21, 2012.

The marriage was unstable. According to Martynova, Velezmoro engaged in acts of domestic violence toward her throughout the marriage. Velezmoro came under the investigation of law enforcement in 2013 based on images of child pornography uploaded to a Microsoft SkyDrive account tied to him. At first, Velezmoro told police officers an implausible story about finding the flash drive containing the images in a park several weeks before his arrest. He later said the flash drive was left by a former housemate and had been in his possession for more than a decade. Eventually, Velezmoro pleaded guilty to possession of child pornography in the second degree. He was sentenced to three months in jail, followed by a year of community custody. The judgment and sentence restricted Velezmoro's contact with minors for five years and provided that the extent and nature of his contact with his child would be determined by the judge in the family court proceeding.[1]

In connection with the criminal proceeding, forensic psychotherapist Michael Comte conducted a psychosexual evaluation of Velezmoro. In Comte's report, he stated that no evidence, including the results of a sexual polygraph, indicated that Velezmoro had engaged in "hands-on sexual contact" with a child.

---

[1] This court affirmed the order of restitution imposed as part of Velezmoro's judgment and sentence. State v. Velezmoro, 196 Wn. App. 552, 384 P.3d 613 (2016), petition for review filed, No. 93882-2 (Wash. Nov. 22, 2016).

2

Nevertheless, the facts suggested that Velezmoro had developed an attraction to child pornography, and he was therefore in need of "clinical attention." Comte further stated, "Although I suspect pedophilia is an apt diagnosis, it is difficult to assign that diagnosis based on the information I reviewed." Based on the lack of evidence of sexual contact with children and several other factors, including an apparent capacity for stable adult intimate relationships, lack of impulsivity, and capacity for empathy, Comte concluded that Velezmoro "presents a low risk for hands-on sexual assault."

Comte recommended referral to a certified sex offender treatment provider for individual and group therapy, in conjunction with polygraph examination and penile plethysmograph assessment. Comte predicted that clinical treatment would likely be necessary for more than a year. He also recommended that Velezmoro's visits with his daughter be monitored until a treatment provider recommends otherwise. Comte stated that conditions of supervision for Velezmoro's offense should include measures to prevent access to pornography through the Internet, random analysis of his computer, and the prohibition of alcohol and drugs. These recommendations were included in the judgment and sentence entered on November 7, 2014.

The parties separated in December 2013 after an argument. On the night of the incident, Martynova called the police and reported that Velezmoro head-butted her. Police officers arrested Velezmoro, and the State charged him with assault in the fourth degree. Martynova acknowledges that Velezmoro was not

3

convicted of a crime based on this incident, and the record does not reflect that he has been convicted of any other domestic violence offense.

A few months after the parties separated, Velezmoro filed a petition for dissolution.

According to the terms of an agreed domestic violence protection order entered after the parties separated, Velezmoro initially visited with M.V. at her home, supervised by Martynova's mother. Later, on Martynova's motion, the court modified the terms of that order and imposed professionally supervised visitation at Velezmoro's expense. Professionally supervised weekly visits continued under the temporary parenting plan.

At some point, a Family Court Services social worker, Emily Brewer, was appointed to conduct a parenting evaluation in the case and submitted a report to the court. The report is not in the record on appeal. Velezmoro has included it as an attachment to his brief. In fact, both parties improperly attach material that is not part of the record on review. These materials will not be considered in our analysis.

Martynova's trial brief, provided to the court before trial, included a proposed visitation schedule. She recommended a structure of three phases of visitation. Martynova proposed that in the first phase, Velezmoro should continue to have weekly professionally supervised visitation with M.V. for 10 years, until she reached the age of 13. Thereafter, conditioned upon Velezmoro's completion of all recommended sex offender treatment, Martynova recommended a second phase that would allow "limited" daytime visits, to be

4

supervised by a nonprofessional. She recommended that this phase continue for two years. Finally, Martynova's proposal recommended that Velezmoro be allowed to petition to transition to phase 3, which would permit unsupervised visits. With respect to the appropriate time to initiate unsupervised contact, Martynova's brief provides: "It is important that unsupervised visits not begin until the child is old enough and able to report any concerns. See also 26.09.184 [guidelines for parenting plans]." She recommended that such transition should be based on the recommendation of a state-certified therapist, mental health counselor, or social worker with expertise in treating child sex abuse victims.

The dissolution trial took place over three days in October 2015. At the time of the trial, M.V. was three years old. Both parties initially retained counsel. At trial, Velezmoro represented himself.

The record on appeal includes only excerpts of the trial testimony and none of the arguments presented to the trial court. The excerpts include the testimony of Comte, who conducted the sexual deviancy evaluation. Consistent with his report, Comte testified that he while was "uncertain" about a pedophilia diagnosis, he said he could not recommend unsupervised visitation at the time of his evaluation, which was before Velezmoro participated in any sex offender treatment. He said the standard length of treatment for pedophilia was three years.

The record includes the testimony of Jay Williamson, who had been Velezmoro's treatment provider for approximately a year at the time of the trial. Williamson thought that Velezmoro's viewing of child pornography had been a

"coping mechanism" or aberrant "opportunity" for "stimulus on the side," rather than a "true deviant kind of sexual behavior." Williamson considered Velezmoro to be a "minimal risk" for re-offending or committing a sex offense against his child. Williamson's assessment of risk was based upon his work with Velezmoro as well as polygraph and plethysmograph results.

Brewer's testimony is included in the record. She testified about her recommendations following the parenting evaluation. Brewer proposed that professionally supervised visitation should continue until Velezmoro completed sex offender treatment. After he completed the treatment, she recommended a period of visitation in public locations supervised by a nonprofessional. Then, when M.V. turned five years old, under the condition that Velezmoro was consistent with the other phases and had no new crimes or violations, Brewer recommended weekly unsupervised visits for up to six hours.

Brewer said that in reaching her recommendations, she spoke with Williamson, the child's pediatrician, Velezmoro's community custody officer, and a professional visitation supervisor. Brewer said she relied "heavily" on Williamson's opinion that there was a "low risk" that Velezmoro would commit a sexual assault. Explaining why she believed that unsupervised visits could begin when M.V. is five, Brewer said,

> I feel like when she's five years old, she's verbal, she has some self-protective capacities. There's no indication that limited daytime visits at that point, if he's consistent and has no longer—no further violations, pose significant risk to her, and I feel that that's in her best interests.

6

Brewer said that restricting the unsupervised visits to public locations served to minimize any risk to M.V. Brewer was not comfortable recommending overnight visits and felt such visits should be incorporated only upon additional court review. And Brewer said that ultimately, while it would never be possible to say there is no risk, she believed that the low risk had to be weighed against the "significant bond" of the parent and child and the benefit to the child of maintaining that bond. Brewer said that she was guided by the purpose of promoting the best interests of the child. Brewer could not recall having evaluated a case involving a child pornography offense, but said she had conducted over 150 parenting evaluations.

The excerpts of trial include Martynova's testimony and the testimony of one of the detectives involved in the investigation of Velezmoro's possession of child pornography offense. The time markers in the transcript indicate that portions of the trial, and perhaps the testimony of additional witnesses, are omitted from the record on review.

At the conclusion of trial, the court entered final orders dissolving the parties' marriage and providing for the care and support of M.V. Based on the court's determination that Velezmoro "demonstrated a limited history of acts of domestic violence" and had been convicted of possession of child pornography, a sex offense, the parenting plan allocates major decision-making authority to the mother and restricts Velezmoro's residential time with M.V. See RCW 26.09.191(2)(a)(iii), (iv).

> First, the Court finds that there is sufficient evidence to conclude
> that the Mother was subject to physical abuse and control by the

7

Father, including his grabbing her around the neck, smothering her with a pillow, pushing her to the floor, and other acts.

Second, the Court finds that the Father was found guilty of Possession of Depictions of Minor Engaged in Sexually Explicit Conduct in the Second Degree, in violation of RCW 9.68A.070(2), 9.68A.011(4)(f)(g), and that he committed the acts alleged in that case. The Husband was convicted of Possession of Depictions of Minor Engaged in Sexually Explicit Conduct in the Second Degree, and he lied to the police about the acts that led to his conviction. However, the Court also finds that it is in the best interests of the minor child that the Father have visitation. The Court found that his visits with the minor child during his professionally supervised visits were positive. The Father has done well in his professionally supervised visits thus far. The Court finds that the Father and minor child have a strong bond with each other. However, the Father's RCW 9.68A Felony Conviction was a very serious mistake that makes it difficult for him to obtain employment. Because the Father must pay for the professionally supervised visits, they are a financial burden to the Father.

The Court intends to follow some of the report recommendations of Emily Brewer, the Family Court Services social worker who conducted the parenting evaluation. Ms. Brewer opined that the minor child could self-report any harm to herself at the age of 5.

The Court orders that the Father's residential time with the child shall be limited and supervised as described below.

**Professionally Supervised Visitation:**

Visitation shall be implemented in three (3) phases:

**Phase I:** The Father has undergone a Washington State certified sexual deviancy evaluation and has been prescribed a recommended program of sex offender treatment, which includes therapy. The Father has participated in this treatment thus far. Phase I will continue during the period of the Father's treatment. During Phase I the Father will have limited residential time equal to two hours on a weekend, to be conducted every other weekend, with a certified, approved, professional supervisor in attendance. Given the seriousness of the allegations regarding child pornography, this Court has determined that this Phase I should continue until the Father has completed his recommended sex offender treatment. The mother shall be a collateral contact and receive monthly reports regarding the Father's sex offender

8

treatment progress, and the Therapist shall communicate with the Mother and any other appropriate contacts in connection with his treatment regimen and in determining whether the Father can discontinue treatment.

The Father shall utilize a professional supervisor approved by the Court and pay all costs associated with a professional supervisor. The Court shall not approve of a supervisor for contact between the children [sic] and the parent unless the Court finds, based on the evidence, that the supervisor is willing and capable of protecting the child. The Court shall revoke Court approval of the supervisor upon finding, based on the evidence, that the supervisor has failed to protect the child or is no longer willing or capable of protecting the child.

**Phase II:** Once the Father has successfully participated in all recommended aspects of his sex offender treatment, and is in compliance with his therapist's recommendations, and has no other violations of the program or his probation, he may have limited supervised visits with a lay, neutral supervisor in Phase II as set forth herein. The visits shall start with visits up to four (4) hours every other week but shall not include any overnight visits. Holiday and Special Occasion visits set forth in Paragraphs 3.7 & 3.8 shall also be four (4) daytime hours and shall be in addition to the regular Phase II visits. Phase II shall not commence until: (i) the Father's therapist certifies that all of the Father's sex offender treatment recommendations have been successfully completed and that Father is ready to transition to the Phase II (lay supervised visits) and Phase III (unsupervised visits); (ii) the Father certifies under oath that he is compliance with the material terms of this Parenting Plan, is in compliance with his sex offender treatment recommendations and has not committed any violations of his probation and has not committed any other crimes involving moral turpitude; and (iii) notice of his certification has been given to the Mother and filed with this Court at least 30 days before the Phase II commences.

The lay supervisor must be selected by or approved by the Mother. Because Mother is Russian, somewhat isolated in the U.S. and must work full-time or more, she may not have any friends or relatives who are able to serve as lay supervisors. In that event, she may select a non-certificated supervisor. Any selected lay supervisor must be knowledgeable of and made aware of the circumstances of Father's RCW 9.68A Felony Conviction. A lay supervisor may be entitled to compensation comparable to a caregiver/sitter (but not at the level of a certified, professional

9

supervisor). If any disputes arise in connection with the arrangement of visitation or the selection of a lay supervisor, disputes shall be referred to a neutral mediator or the court. Visits shall occur in a public place. The Mother and Father shall not contact each other directly during Phase II, other than emails solely involving the arrangements for the visit or relating to the health and safety of the child. The lay supervisor shall follow the same protocol as a professional supervisor: the child should be handed to a lay supervisor in a safe, public, assigned location, and then later introduced to the Father. At the end of the visit, the Father should hand the child to the supervisor, leave the area and then allow the lay supervisor to hand the child over to the Mother. The Mother shall be allowed to maintain her privacy and confidentiality. After demonstrating compliance with Phase II for a reasonable period of time, the Father may petition the court for more frequent daytime visitation with a lay supervisor if more frequent visits would be in the best interest of the child, provided that visits shall not be more frequent than once per week.

**Phase III:** It is important that unsupervised visits not begin until the child is old enough and able to self-report any concerns or harm that may occur during unsupervised visits. See also 26.09.184. This Court finds that when the minor child reaches her sixth (6th) birthday, she will be old enough to self-report any harm that may occur. During Phase III, visits shall be for six hours, every week, although the Father may petition for more daytime hours. Holiday and Special Occasion visits set forth in Paragraphs 3.7 & 3.8 shall also be four (4) daytime hours and shall be in addition to the regular Phase [III] visits. No overnight visits shall be permitted. The Mother shall not be required to contact the Father directly during Phase III, other than emails solely involving the arrangements for the visits. The Mother shall be entitled to arrange a facilitator to handle the exchange of the child. All visitations should be in a public place and no words should be exchanged, other than what is absolutely necessary to provide for the exchange of the child. The court anticipates that the plan will move toward a "regular" visitation schedule after the parties agree or the court reviews the case.

If at any time the Father commits a gross misdemeanor (involving moral turpitude) or felony or fails to register as a sex offender, violates probation or the Father's or minor child's counselors believe that it is more likely than not that continued visits are detrimental to the minor child, then Father's visitations will be terminated until such time as the Court approves resumption of any visitation.

10

Martynova appeals. She contends that the parenting plan's limitations on the father's contact with the child are insufficient to protect the child. She particularly objects to the provision that phase 3 unsupervised visits may begin when the child is six, which is tied to a finding that the child will at that age "be old enough to self-report any harm that may occur."

We review a parenting plan for abuse of discretion. In re Marriage of Caven, 136 Wn.2d 800, 806, 966 P.2d 1247 (1998). The court's discretion must be guided by the provisions of the Parenting Act of 1987, including RCW 26.09.191. In re Marriage of Katare, 175 Wn.2d 23, 35-36, 283 P.3d 546 (2012), cert. denied, 133 S. Ct. 889 (2013). We are reluctant to disturb decisions regarding residential provisions because it is the trial court that hears evidence and observes witnesses. In re Parenting & Support of C.T., 193 Wn. App. 427, 442, 378 P.3d 183 (2016). "A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

If a trial court finds that a parent has engaged in a history of acts of domestic violence or has been convicted of certain sex offenses, including possession of child pornography under RCW 9.68A.070, the court may not impose mutual decision-making and must limit the parent's residential time. RCW 26.09.191(2)(a)(iii), (iv)(H). Such limitations must be "reasonably

calculated to protect the child from the physical, sexual, or emotional abuse or harm that could result if the child has contact with the parent requesting residential time." RCW 26.09.191(2)(m)(i). The court decides what restrictions on the parent's contact with the child are necessary. RCW 26.09.191(2)(m)(i). Appropriate limitations may include supervised visits or completion of relevant counselling or treatment. RCW 26.09.191(2)(m)(i).

The trial court restricted Velezmoro's time with his daughter as required by RCW 26.09.191. Martynova contends that the court abused its discretion because the plan for phase 3 relies on the child's presumed ability to self-report harm if it occurs. Relying on scholarly articles, some of which are attached to her brief, Martynova presents statistics about the percentage of individuals arrested for possession of child pornography who also perpetrate or attempt to perpetrate actual sexual offenses against children and the percentage of child sexual abuse victims who are abused by a family member. Martynova argues that age is not a reliable indicator of whether a victim will report abuse and that, as a general matter, reliance on a victim's reporting ability is dangerous and ignores the power relationships and secrecy that are inherent in child sexual abuse and the reality that the majority of victims do not report the abuse.

These are valid points. They would be compelling if the record showed that the trial court left the child unprotected based on the obviously incorrect assumption that a six-year-old child can be counted on to report sexual abuse. But the trial court did not make that assumption. The parenting plan surrounds the child with protection.

12

Our ability to fully review Martynova's challenge to the visitation restrictions is significantly hampered by the incomplete record on appeal, which makes it impossible to determine whether and how arguments were preserved. As the appellant, it is Martynova's burden to provide this court with a record sufficient to review the issues raised on appeal. Story v. Shelter Bay Co., 52 Wn. App. 334, 345, 760 P.2d 368 (1988). We consider only evidence that was before the trial court at the time a decision was made. See RAP 9.1; 9.11. Martynova's arguments on appeal rely in part on articles and statistics attached to her brief, with no indication that such information was presented at trial.

Even so, it is clear from the portions of the record we have, and from the parenting plan itself, that the trial court did not neglect its obligation to impose restrictions reasonably designed to protect the child and did not assume that the child's verbal ability at age six would enable her to protect herself. The court considered evidence specific to Velezmoro that he was a minimal risk for reoffending or for offending against his child, that he was engaging in treatment, that he had done well in supervised visits so far, and that he and his child were bonded. The plan provides many checks and many opportunities for Velezmoro's contact to be restricted if there is any reason to believe the level of risk he presents has increased. Contrary to Martynova's assertion in her brief, even the unsupervised visits in phase 3 must occur in the daytime and in a public place; the plan allows no overnight visits. The court weighed, as it was obliged to do, the risks of visitation against the child's interest in maintaining the bond with her father. The plan advocated by Martynova would have required professionally

supervised visits until age 13 and would not have permitted unsupervised visits until age 15. We cannot say the trial court abused its discretion by concluding Martynova's proposed limitations were more extreme than was necessary to protect the child.

While Martynova now insists that "Age is NOT a Key Factor for Disclosure," that was not her position below. The parenting plan was in large part drafted by Martynova. Its language, stating that unsupervised visits should not begin "until the child is old enough and able to self-report any concerns or harm," directly mirrors the language of her trial brief. Martynova thus encouraged the court's consideration of age and ability to self-report.

Based on the evidence, the court determined that unsupervised daytime visits in a public place could begin when M.V. reached the age of six, assuming the father's compliance with all requirements during the first two phases of visitation and no new crimes or violations. The trial court's ruling does not suggest, nor should this court's opinion be construed to hold, that at age six a child can be presumed likely to report abuse or that any particular age can serve as what Martynova refers to as an "automatic trigger" for unsupervised contact. The evaluation of risk and the child's best interests will be different in each individual case. Here, the court concluded that M.V.'s best interests included continued regular visits with her father and eventual unsupervised visits with him. The provisions of the parenting plan include substantial protective measures and conditions and are reasonably calculated to protect the child from abuse or harm. Martynova fails to demonstrate that the court abused its discretion.

Martynova contends Brewer's opinion was unsupported and beyond her expertise and that the court abused its discretion by admitting and relying on Brewer's testimony. Those arguments are not preserved for appeal because any objection Martynova may have made to Brewer's testimony is not within the portion of the trial that was transcribed. Martynova also contends that Brewer's report, referenced in the parenting plan, was not admitted into evidence. It is impossible to verify whether this is so without a complete record. Even if true, Brewer testified about the substance of her recommendations. Reference to the report in the parenting plan does not undermine the court's decision.

Martynova claims the court relied "exclusively" on Brewer's testimony in formulating the restrictions. The record does not support this claim. As discussed above, the trial court considered information from Velezmoro's treatment provider and from an expert witness who had evaluated Velezmoro in connection with the trial on the criminal charge. To the extent Martynova contends Brewer's opinion was unworthy of credence, that is not an argument this court can consider. Our task on review is limited to determining whether the court's findings are supported by the record and whether they, in turn, reflect consideration of the appropriate factors. "We do not reweigh the evidence." In re Marriage of Kim, 179 Wn. App. 232, 244, 317 P.3d 555, review denied, 180 Wn.2d 1012 (2014).

Finally, Martynova contends the judgment amount should include $1,750.00 in moving expenses and attorney fees that were awarded to her in a June 2014 temporary order. She asks this court to remand the decree to make

No. 74343-1-I/16

this correction. Martynova does not demonstrate trial court error. The decree

and the court's findings indicate that the issue of attorney fees and costs was

reserved. The incomplete record on appeal does not show that Martynova asked

the court to award the previously imposed fees and expenses in the decree or

that the trial court intended to do so. Because Martynova does not provide

meaningful argument or citation to legal authority in support of her request to

remand the decree for correction, we do not consider it. Cowiche Canyon

Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Affirmed.

Becker, J.

WE CONCUR:

Cox, J.