IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Marriage of
TERESA CHIKOORE (n/k/a
Teresa Sciarretta),

          Appellant,

and

NGONIDZASHE CHIKOORE,

          Respondent.

No. 81123-1-I

DIVISION ONE

UNPUBLISHED OPINION

SMITH, J. — This case involves the marriage dissolution of Teresa Chikoore, n/k/a Teresa Sciarretta, and Ngonidzashe Chikoore,[1] the coinciding parenting plan for their daughter, E.C., and Teresa's petition for relocation. After a trial, the court denied Teresa's petition to relocate with E.C. to Jalisco, Mexico, determined that E.C. would reside with Ngoni the majority of the time, and denied Teresa's petition for a permanent restraining order against Ngoni.

We hold that the trial court erred in finding that E.C. should not reside with Teresa the majority of the time. The trial court also erred when it denied her relocation petition based on findings that are not supported by substantial evidence. Therefore, we remand for entry of a new parenting plan consistent with this opinion and reverse the order denying Teresa's relocation petition. In addition, the trial court exhibited bias by relying on an extrajudicial source, and

---

[1] Ngonidzashe is referred to as Ngoni below. We therefore refer to him as Ngoni, and for clarity and consistency, we refer to Teresa by her first name.

Citations and pin cites are based on the Westlaw online version of the cited material.

on remand, the case must be assigned to a different judge to enter the parenting plan and to decide whether Teresa is entitled to a restraining order.

FACTS

Teresa and Ngoni met in high school, where they dated for several years. They reconnected in 2011 while Teresa lived in Los Angeles, California, and worked at a Pilates studio. At the time, Ngoni lived in Seattle, Washington. In 2012, Teresa moved to Seattle, and she and Ngoni moved into a townhouse, where Teresa opened Pilates Into Life LLC, a Pilates studio. The couple married in March 2013. In December of that year, Teresa had E.C. During that time, Ngoni struggled with alcoholism, leading to an eventual intervention by Teresa's stepfather and other family and friends.

In 2015, Teresa and Ngoni moved out of their townhouse and into a home that Teresa's mother and stepfather, Karen and Steve Motenko (Motenkos), had purchased. Shortly thereafter, Teresa and Ngoni signed a lease for a larger Pilates studio, and Ngoni became a managing member of Pilates Into Life. Around the same time, Ngoni and Teresa enrolled E.C. in Loyal Heights, a "cooperative preschool." Because Loyal Heights is a cooperative preschool, one "parent had to attend what [the school] called workdays." Ngoni attended the workdays every Thursday.

Throughout her time growing up in Seattle, E.C. has remained close to both sides of her family. In particular, Ngoni's mother, Caroleen Chiorah, lives in Seattle, and she and E.C. have a very close bond. Ngoni's son, L.M., L.M.'s half brother, C.M., and Ngoni's cousins also live close to Seattle, and E.C. would visit

them on a regular basis. Up until 2017, Teresa's family, including her sister, Erica Sciarretta, her father and stepmother, Emil Sciarretta and Susan Adolfi, and the Motenkos also lived in Seattle or the surrounding cities.

In late 2017, the Motenkos retired and moved to the Lake Chapala area of Jalisco, Mexico. Teresa and Erica visited the area, and Erica began making plans to move there. Ngoni and Teresa also began making plans to move to the area and looked into a private school for E.C. According to Ngoni's testimony at trial, he and Teresa decided to move to the area to be close to the Motenkos and to expand their Pilates business.

In March 2018, Ngoni traveled to his country of birth, Zimbabwe, for the first time since he was nine. At the same time, Teresa traveled with E.C. to Jalisco. Because Ngoni was in Zimbabwe, Ngoni signed his power of attorney over to Teresa so that she could purchase their home. With an inheritance Teresa received from her late grandfather, she and Ngoni—through Teresa acting as his power of attorney—purchased land near Lake Chapala in Jalisco with a contract to build a three-bedroom home and a Pilates studio. While purchasing the property in Mexico, Teresa worked with a friend and fellow Pilates instructor, Deanna Garcia, and they taught a sold out Pilates retreat in the area.

When she and Ngoni returned to Washington after their trips, the relationship began to dissolve rapidly. Ngoni was depressed. The trip to Zimbabwe caused him severe emotional distress, he had lost significant weight, and he was visibly ill. E.C. became upset because of Ngoni's depression and asked her mother what was wrong with him.

3

On Mother's Day 2018, while Teresa drove the family to church, Ngoni had an outburst, expressing suicidal ideation while E.C. was in the vehicle. Due to Ngoni's outburst, "E.C. was crying very hard in the backseat, and she kept saying, 'Daddy, don't leave us.'"

Following the incident, Teresa asked Ngoni to seek psychiatric help and accompanied him to his first two psychiatric appointments. During these appointments, Ngoni expressed that he had thoughts of hitting or killing Teresa. The psychiatrist prescribed lithium to Ngoni, but he stopped taking it in August 2018 with his psychiatrist's approval.

On July 21, 2018, Teresa asked Ngoni to move out. E.C. remained with Teresa. On August 10, 2018, Teresa filed for divorce. She requested that E.C. reside with her the majority of the time and sought a temporary restraining order against Ngoni.

A month later, Teresa requested an immediate ex parte restraining order. Following her request, the court held a hearing on Teresa's petition for a restraining order and temporary parenting plan. The court placed E.C. in Teresa's care. It granted Teresa's restraining order because Ngoni "represent[ed] a credible threat to the physical safety of" Teresa. The court also appointed a court appointed special advocate (CASA) to speak with Ngoni's psychiatrist and to examine the benefits and detriment of Teresa's potential relocation to Mexico. The court entered a temporary family law order, which required Ngoni to submit to a drug-alcohol assessment, to continue his mental health treatment as recommended by his psychiatrist, and to submit to urinalyses

(UAs).  If Ngoni's UAs came back positive, the court would restrict his residential time with E.C.

On October 26, 2018, Ngoni had a positive UA for alcohol.[2]  He did not notify Teresa or the court until January 2019.

On November 2, 2018, Teresa filed a notice of intent to relocate to Lake Chapala with E.C.  Teresa stated that she could not afford to live in Seattle but that she could afford the cost of living in Mexico.  She asserted that her Lake Chapala home would be complete by December 15, 2018.  Ngoni objected to E.C.'s relocation with Teresa and contended that he was E.C.'s primary caretaker until Teresa filed for divorce.

On January 28, 2019, the court held a hearing on the temporary relocation.  The CASA was not prepared to make a recommendation at the time. When the court entered its order granting Teresa's petition for temporary relocation, it found that she had "good reasons" for wanting to relocate to Mexico. The court allowed Teresa to relocate to Mexico with E.C. pending the dissolution/relocation trial in July.  The court ordered Ngoni to continue taking two random UAs a month and provide "the results of all UAs to the Mother's attorney" within five days.  Teresa and E.C. moved into the Lake Chapala home in February 2019.

The trial began on July 8, 2019.  Teresa requested that E.C. reside the majority of the time with her and that E.C. be allowed to permanently relocate to

---

[2] The order states that the UA was "on or about October 26, 2019."  This is clearly a scrivener's error.

Mexico. She testified in favor of relocation and provided additional witnesses in support of the relocation, including Teresa's stepfather and Ngoni's previous partners, Crystal Wahl and Courtney Malloy.[3] In particular, Wahl and Malloy testified to incidents where Ngoni acted violently toward them and their children, and Malloy testified that Ngoni drank and drove following his and Teresa's separation. Teresa testified to experiences of alcohol and marijuana use affecting Ngoni, their relationship, and his ability to care for E.C. She also testified that, in high school, Ngoni "forcibly [made her] have sex with him after [she] said no."

The CASA testified at trial that when she discussed Ngoni's parenting with others, no one had concerns about Ngoni's alcoholism affecting his parenting of E.C. Nonetheless, she recommended that Ngoni complete the substance abuse evaluator's recommendations to attend a substance abuse educational group once a week for six months, to complete individual therapy sessions, and to continue UA testing. The CASA also recommended that Ngoni continue psychotherapy "to address his tendency to depression and to learn how to be a healthy father" to E.C. She recommended that Teresa also seek counseling. However, because "the move had been made, basically," the CASA recommended that E.C. "reside primarily with the mother in Mexico."

Ngoni testified at trial that he had been "diagnosed with chemical dependency." He also testified that the move concerned him because he would

---

[3] We discuss the trial testimony in detail below where it is applicable to the trial court's findings of fact and conclusions.

be unable to teach E.C. his language or his culture's music and that E.C. had just "started picking . . . up [Shona]," his native language.[4]

At the conclusion of trial, the court temporarily ordered that E.C. reside with Ngoni. Later, before the court's final ruling, an incident occurred outside of the courtroom involving the father, E.C., and the mother's family. The court provided no details about the incident on the record but explained that the incident would affect its decision. The court ordered that E.C. spend the majority of her residential time with Ngoni, and it denied Teresa's petition for relocation and her request for a restraining order. Teresa appeals each of the court's orders.

<u>Appearance of Fairness Doctrine</u>

As an initial matter, Teresa contends that the trial court showed bias against her based on extrajudicial evidence and that, therefore, we must assign the case to a different judge on remand. Because the trial court explicitly stated it would consider extrajudicial information in its ruling, we agree.

"[T]rial before an unbiased judge is an essential element of due process." <u>In re Pers. Restraint of Davis</u>, 152 Wn.2d 647, 692, 101 P.3d 1 (2004). "At a minimum, due process 'requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.'" <u>Davis</u>, 152 Wn.2d at 692 (internal quotation marks omitted) (quoting <u>Bracy v. Gramley</u>, 520 U.S. 899, 904-05, 117 S. Ct. 1793, 138 L. Ed. 2d 97

---

[4] Shona is the language of the Shona people of Zimbabwe, where Ngoni was born.

(1997)). "The test for determining whether a judge's impartiality might reasonably be questioned is an objective one that assumes the reasonable person knows and understands all the relevant facts." In re Estate of Hayes, 185 Wn. App. 567, 607, 342 P.3d 1161 (2015). The party asserting that the trial judge was biased must overcome the presumption that "a trial judge properly discharged [their] official duties without bias or prejudice" by providing "specific facts establishing bias." Davis, 152 Wn.2d at 692. For example, a court's remarks may support a bias challenge "if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555, 114 S. Ct. 1147, 127 L. Ed. 2d 474 (1994).

Here, the trial court explicitly stated that extrajudicial information would negatively affect its rulings. Specifically, it said that its decision regarding placement would be affected by Erica's inappropriate behavior. The full conversation follows:

> And I want to say that the family behaved very inappropriately, and I tell you that, that your friends, family's behavior towards the father, towards the child in the courthouse *reflects negatively to you because that's the atmosphere that I have to think where the child will be impacted by those who are close to her.* And your sister is the one that you said you want to be close to. You testified to that. That's the person who behaved badly.
>  . . . .
>  . . . I just want to tell you that, *that has an impact on the Court.* Parents have -- the Court has no jurisdiction on other people. They are not parties. But you two are. And you two have to have control of where the child is and how the child will be impacted by the atmosphere that you provide. If you find a particular friend not to be appropriate, a particular family member not to be appropriate, it is up to you and it's a requirement of being a parent to make that decision, to provide the safest and best

8

environment for your child.

The mother responded:

> I completely agree that how my family reacted was not acceptable.
> I spoke to all of them after that incident. It was an emotional
> reaction from the stress leading up to that moment. And it wasn't
> okay. And I have spoken to all of them. That is also why they are
> not here today, to show respect to the Court and to Mr. Chikoore.
> That was an isolated incident. That will not happen again. And I
> have done everything in my power to make sure that doesn't –

But the court stopped the mother, not satisfied with her apology, and stated, "[I]t would have been better to hear from the person who did it than you."

These statements alone provide sufficient evidence that the court showed bias against Teresa, relying on a negative incident that occurred outside of the courtroom. However, many of the court's findings after these statements also support Teresa's assertion of the court's bias. For example, the court found:

> Ms. Chikoore has shown an entitlement attitude during the entire
> trial. In her testimony she has been self-righteous with disregard
> for Mr. Chikoore's input, opinion, questions or objections.
>
> The court finds Ms. Chikoore less than credible in her testimony as
> to the parenting issues and allegations against Mr. Chikoore. The
> court finds that Ms. Chikoore, at times, exaggerated Mr. Chikoore's
> behavior in order to get her way and the temporary approval of her
> relocation to Mexico.[5]

The court showed antagonism toward Teresa due to her family's inappropriate behavior. It is commonplace for parties to be emotional and aggressive during dissolution proceedings, but the court used that commonplace

---

[5] Teresa challenges these and a number of other findings entered by the court. Because these findings are irrelevant to the proceedings, except insofar as they show the trial court's antagonism against Teresa, we do not address whether they are supported by substantial evidence.

9

behavior to form a negative assessment of Teresa. Specifically, the court found that Teresa was "heavy-handed in handling her case and in the manner that she proceeded." The trial court failed to act with impartiality by deriving a negative opinion of Teresa based on information from an extrajudicial source. Accordingly, the case must be remanded to a different judge for entry of the orders discussed below.

Trial Court Orders

Teresa contends that the trial court's findings of fact are not supported by substantial evidence and that the trial court's orders are manifestly unreasonable. First, we address the factual findings, and then, we address the trial court's conclusions of law.

We review the trial court's rulings on relocation petitions, parenting plans, and restraining orders for abuse of discretion. See In re Marriage of McNaught, 189 Wn. App. 545, 552, 359 P.3d 811 (2015) (parenting plan); In re Marriage of Horner, 151 Wn.2d 884, 893, 93 P.3d 124 (2004) (relocation); RCW 26.09.050(1) (restraining order). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." In re Marriage of Littlefield, 133 Wn.2d 39, 46-47, 940 P.2d 1362 (1997). "'A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard.'" Horner, 151 Wn.2d at 894 (quoting Littlefield, 133 Wn.2d at 47). "'[I]t is based on untenable grounds if the factual findings are unsupported by the record[, and] it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet

the requirements of the correct standard.'" Horner, 151 Wn.2d at 894 (quoting Littlefield, 133 Wn.2d at 47).

Factual Findings

Teresa presented 101 assignments of error, most of which assert that the trial court's findings are unsupported by the record. The challenged factual findings pertain to (1) Ngoni's substance abuse, (2) Ngoni's mental health problems, and (3) Teresa's business plan for Mexico and the parties' agreement to move to Mexico.[6]

"We will reverse a trial court's factual findings only if they are unsupported by substantial evidence," i.e., "'evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" In re Marriage of Raskob, 183 Wn. App. 503, 510 & n.7, 334 P.3d 30 (2014) (quoting Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

As an initial matter, the court concluded that Teresa's testimony was not credible. And "[c]redibility determinations are for the trier of fact and cannot be reviewed on appeal." State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). However, the record contains uncontroverted evidence that corroborates Teresa's testimony, and therefore, the challenged findings of fact are not supported by substantial evidence. Thus, we agree with many of Teresa's assignments of error.

---

[6] Because, as discussed below, we remand the issue of the restraining order to the trial court, we leave the entry of a finding regarding Ngoni's alleged history of domestic violence to that court.

1.    Findings Regarding Substance Abuse

Teresa asserts that the trial court's findings regarding Ngoni's alcoholism

are unsupported by the record.  We agree.

The court found:

> While the father has a history of alcohol and marijuana use and his
> record shows a DUI [driving under the influence of an intoxicant]
> conviction and a series of driving with suspended license of varying
> degrees, he had stopped alcohol use for 4 years and has stopped
> marijuana use.  On this issue, the CASA's report and the witness'[s]
> testimony do not indicate concerns for [E.C.] and the father's
> parenting of her.  The court does not find that the father's parenting
> functions are affected by his use of alcohol or marijuana.

The CASA's testimony supports the trial court's conclusion:

> I could not find, even with all of the concerns about his use of
> alcohol and his use of marijuana, any point where the child had --
> or his ability to parent the child had been impacted.  While many
> people expressed concerns about that, no one expressed anything
> that told me that there was a concern about the father spending
> time with the child.

Accordingly, the CASA felt that there was no "reason for restricting the father's

time with the child."

However, there was corroborated evidence presented at trial that Ngoni

previously struggled and is still struggling with his drinking and substance use.

Teresa's stepfather, Steve, testified to an incident of Ngoni drinking at Steve's

birthday party in July 2014; E.C. was around six months old at the time.

Specifically, Ngoni got too intoxicated at dinner, and Steve believed it was time

for an intervention.  Over 11 people helped with the intervention.  During the 90

days following the intervention, Ngoni went to 90 Alcoholics Anonymous (AA)

meetings. Although he stopped going to AA meetings, Ngoni remained sober until the dissolution proceedings began.

Nonetheless, with regard to his ability to manage his drinking habits, Ngoni stated in his deposition, "[S]ometimes I'd succeed, and sometimes I wouldn't. . . . But thankfully . . . nobody – nobody was killed." When asked if he had a problem with alcohol, he said, "Of course," and "I have an addictive personality." Ngoni also disclosed that he drank while Teresa was pregnant and while E.C. was a baby, admitting, "I was struggling but still managing to show up at the places that I needed to and do the things that I needed to get it together." He also admitted to smoking marijuana when E.C. was a toddler, and he testified that, after E.C. was born, he "would certainly come home drunk."

Furthermore, the record indicates that Ngoni continues to have problems with drinking and marijuana use. Specifically, Ngoni failed two UAs during the dissolution proceedings, one for marijuana use and one for alcohol use. He failed these UAs when he knew that he was being monitored. In addition, Malloy, testified that she knew Ngoni drank in the month prior to trial and that during that time, he also drove while under the influence, despite having a DUI conviction and other significant traffic infractions. Accordingly, substantial evidence does not support the trial court's finding that Ngoni has resolved his substance abuse issues. On remand, the court should determine whether Ngoni's recent alcohol and marijuana use warrants any restrictions in the parenting plan.

2.      Findings Regarding Mental Health

Teresa contends that the trial court erred when it concluded that Ngoni did not suffer from mental health issues. Because the record provides evidence of ongoing mental health issues, we agree.

The court found "that while the mother made allegations of mental health against the father, she did not produce expert testimony, or even a proper diagnosis to support her claims." It further found that the incident on Mother's Day "was a one-time episode with physical and emotional components" and that Ngoni "recovered physically and emotionally." In support of this determination, the court cited evidence at trial that Ngoni's psychiatrist took him off lithium because they concluded that, contrary to Teresa's contention, Ngoni was not bipolar.

Although the trial court found Teresa's testimony not credible, Ngoni's testimony corroborated her statements regarding his mental health struggles. Ngoni testified that after his trip to Zimbabwe, where he saw his father for the first time since he was nine, he "got sick" because it "shook him up." On Mother's Day, Teresa was driving and attempting to get out of the way of another vehicle. Ngoni testified that an argument ensued and that he "blew up" and "was very upset." He admitted, "[I]n that moment, I wanted out of the situation. And that scared my wife, and my daughter was in the car."

Ngoni and Teresa subsequently saw a psychiatrist together. Ngoni told the psychiatrist—in front of Teresa—that, in the past, he had thoughts of harming her and killing her. Ngoni provided no evidence that he resolved his mental

14

health challenges, and he ignored all of the parties' recommendations, including the court's, when he discontinued therapy. In addition, Ngoni showed E.C. videos of individuals, including children, hanging from a bridge. This evidence of ongoing and prior thoughts of harming Teresa and inappropriate parenting techniques undermines the court's finding that Ngoni's mental health issues revolved solely around the Mother's Day incident.

Furthermore, despite the court's findings to the contrary, Teresa was not required to produce expert testimony regarding Ngoni's mental health issues. Specifically, "[o]ur rule[, ER 702,] allows an expert to testify about [their] specialized knowledge if it would help the jury understand the evidence, but the rule does not require expert testimony where it would not be helpful to the jury." See In re Pers. Restraint of Phelps, 190 Wn.2d 155, 163, 410 P.3d 1142 (2018) (concluding that the State was not required to provide expert testimony of grooming when, in closing arguments, it discussed how the defendant, charged with child molestation, groomed the victim). But Teresa was describing Ngoni's behavior, not diagnosing his mental health issues.

Based on Ngoni's admission to the described behavior, the court erred when it concluded that Ngoni had resolved his mental health issues. The uncontroverted evidence supported a finding that Ngoni recently suffered from depression, suicidal ideation, and potentially inappropriate parenting practices. Therefore, we conclude that the trial court's findings that Ngoni's mental health challenges were resolved after his Mother's Day breakdown are unsupported by the record.

3.    Findings Regarding Mexico

The mother contends that the trial court's findings regarding the parties' plan to move to Mexico were unsupported by the record. We agree.

Among other findings, the court found that Ngoni and Teresa had no plans to move to Mexico prior to their separation. But Ngoni testified that he and Teresa planned on moving to Mexico after she went to visit her family and had her first Pilates retreat. Specifically, Ngoni testified that he, Teresa, and E.C. "were going to follow" the Motenkos to Mexico "in order to be closer to them." Teresa also introduced into evidence an e-mail from Ngoni acknowledging to the Motenkos that he and Teresa were trying to move to Jalisco.[7] Ngoni testified that after the Mother's Day incident and his subsequent therapy, he and Teresa focused on "moving to Mexico and planning for Mexico, expanding [the Pilates business] into Mexico." Thus, contrary to the trial court's finding, according to Ngoni's testimony, he and Teresa planned to move to Mexico and build a Pilates studio before he went to Zimbabwe. And they continued planning after he returned. However, Ngoni testified that he did not believe that E.C. would move to Mexico after he and Teresa divorced.

Ngoni testified that he and Teresa had started a business plan, which supported her testimony regarding her business plan. But the court found: "While the Court is stopping short from the finding of '*bad faith*', the Court is concerned that the mother has dislodged [E.C.] from her surroundings, her

---

[7] Specifically, Ngoni's e-mail to Karen states, "[I]n our efforts to move [to Jalisco,] I wanted to know how far this plot [of land] is from you."

school, her friends, her regular life and her close family on a *whim* without [a] proper plan in place." The court also found that Teresa could not provide a stable living environment for E.C. in Jalisco because she failed to provide evidence of her income, her business plan, or her ability to care and provide for E.C. In addition, the court concluded that Teresa did not have the ability to work in Jalisco and that this was fatal to her business plans.

The objective facts in the record support contrary conclusions. Teresa took the Pilates equipment from the Washington studio to Mexico. The studio is built and ready for occupancy. And Teresa has already incorporated the business in Washington in order to sell Pilates retreats in Mexico, which will occur in the future.[8] At the time of trial, there was a retreat scheduled for November, providing that the retreat portion of the business was running. Finally, E.C.'s previous nanny, Candace Harvey, went to Teresa's Lake Chapala home and witnessed Teresa working on her business "while E.C. [was] at school." These facts are sufficient to prove that Teresa has a business plan in place and has made significant steps towards opening the business.

Teresa testified that she would receive a temporary visa days after trial. She also explained why the studio portion was not open for business yet: "[I]n order to work in Mexico, I need to have a temporary or permanent visa as well as a work permit if on a temporary visa. And I can't start the process until the

---

[8] To the extent that the court relied on the fact that the business was incorporated in Washington to support its conclusion that the business was merely a dream, we disagree. The business's incorporation does not affect the fact that the business sells Pilates retreats to *Mexico*, where Teresa will have to teach the customers.

divorce is final to get all of those documents in my maiden name." She also cannot start the process of getting a visa until she can be certain that she will be able to remain in Mexico for more than 30 days. Because of the dissolution proceedings, Teresa chose to wait.

Teresa's business plan is clear, and she sufficiently explained the delay in obtaining her work visa. These explanations highlight the error in the trial court's findings that Teresa was nothing "more than a tourist" and that she had taken no steps to receive a work visa.[9] For these reasons, we conclude that the record does not support the trial court's findings that Teresa did not have concrete personal or business plans in Mexico, that she could not provide for E.C. in Mexico, and that she could not work in Mexico.

*Parenting Plan*

Teresa contends that the trial court erred in entering numerous findings in the parenting plan and in its decision to designate Ngoni as the parent with whom E.C. resides the majority of the time. Because many findings of fact that the trial court relied on to make its determination are unsupported by the record, we agree and remand for the trial court to enter a new parenting plan.

As discussed above, we review a parenting plan for abuse of discretion. McNaught, 189 Wn. App. at 552. In entering a parenting plan, the court adheres to the following objectives:

> (a) Provide for the child's physical care;
> (b) Maintain the child's emotional stability;

___

[9] We also note that, contrary to the trial court's finding, the record indicates that Teresa did not lie to the court during the temporary relocation proceedings.

(c) Provide for the child's changing needs as the child grows and matures . . . ;
(d) Set forth the authority and responsibilities of each parent with respect to the child . . . ;
(e) Minimize the child's exposure to harmful parental conflict;
 . . . .
(g) To otherwise protect the best interests of the child.

RCW 26.09.184(1)(a)-(g).  The court "must make parenting plan decisions which are based on the actual circumstances of the parents and of the children as they exist at the time of trial."  Littlefield, 133 Wn.2d at 57.

Here, the record indicates that E.C.'s placement with Ngoni a majority of the time is not in her best interest.  The evidence provided multiple instances of Ngoni's behavior failing to act in accordance with E.C.'s best interests.  In particular, Ngoni's actions have shown that he fails to understand E.C.'s developmental needs.  Ngoni testified that he showed E.C. a six-minute video of numerous individuals being or already hanged in an attempt to educate her on the historical and current treatment of Black people in America.  The video included images of a mother lynched on one side of a bridge and her child hanging from the other side of the bridge.

Moreover, Ngoni failed to appear for a scheduled visit on Christmas Day, which, unsurprisingly, upset E.C.  Ngoni also has endangered E.C. while driving illegally and causing a car accident.  Specifically, in 2016, while his license was suspended, Ngoni hit another vehicle after he got angry while driving.  E.C. and Teresa were in the car, but both were unharmed.

In contrast to the record's clear indication of struggles that Ngoni faces as a parent, the record provides no indication that Teresa has had difficulty acting in

E.C.'s best interests. And the trial court made no determinations that she had difficulty parenting E.C. or acting within E.C.'s best interest. For these reasons, we conclude that the trial court erred when it granted Ngoni's request that E.C. spend the majority of her residential time with him because it is in E.C.'s best interest to spend the majority of her residential time with Teresa. Thus, we vacate the parenting plan and remand to the trial court for entry of a parenting plan consistent with this ruling. When the trial court enters a new parenting plan, it should review the propriety of ordering RCW 26.09.191[10] restrictions for Ngoni.

*Relocation Petition*

Teresa contends that the trial court abused its discretion when it denied her petition to relocate. Because the record does not support the trial court's findings and determinations regarding the relocation factors, we agree.

As an initial matter, because we conclude that Teresa should receive the majority of E.C.'s residential time, we conclude that the statutory presumption in favor of her relocation with E.C. applied. In a recent unpublished case, the trial court granted a temporary order allowing the mother to relocate with the child prior to the parties' dissolution decree. In re Marriage of Finken, No. 73824-1, slip op. at 1 (Wash. Ct. App. Mar. 13, 2017) (unpublished), http://www.courts.wa.gov/opinions/pdf/738241.pdf. But after trial, the court concluded that the child would spend the majority of their residential time with the father and denied the mother's petition for relocation. Finken, slip op. at 5, 6. On

---

[10] RCW 26.09.191(2)(a) provides the court the means to limit or otherwise restrict a parent's time with their children if the parent has, for example, a history of domestic violence.

appeal, the mother asserted that the trial court erred because it failed to apply the statutory relocation presumption. Finken, slip op. at 11-12. We disagreed, concluding that the court first must go through the parenting plan factors in RCW 26.09.187 to determine which parent the child would reside with a majority of the time. Finken, slip op. at 11-12. We held that, because the child would reside with the father the majority of the time, the relocation petition was "moot." Finken, slip op. at 13. While there is authority that suggests a court may decide the parenting plan before or after the relocation petition,[11] finding Finken persuasive, we believe, at a minimum, the court should first determine who the child will reside with the majority of the time. Because we conclude that E.C. should reside with Teresa the majority of the time, we apply the presumption for relocation in her favor when reviewing her petition.

"We review the trial court's decision to grant or deny a petition for relocation for an abuse of discretion." In re Marriage of Kim, 179 Wn. App. 232, 240, 317 P.3d 555 (2014). "Our task on review is limited to determining whether the court's findings are supported by the record and whether they, in turn, reflect consideration of the appropriate factors." Kim, 179 Wn. App. at 244. "We defer to the trial court's ultimate relocation ruling unless it is manifestly unreasonable or

---

[11] See In re Marriage of Kim, 179 Wn. App. 232, 246, 317 P.3d 555 (2014) (finding no error with the trial court's decision to resolve the petition for relocation before entering a parenting plan and designating the majority of the children's residential time to either parent); In re Marriage of Fahey, 164 Wn. App. 42, 57, 262 P.3d 128 (2011) ("If there is no parenting plan, whether a party is 'a person with whom the child resides a majority of the time' under RCW 26.09.430 is a question of fact.'" (quoting In re Parentage of R.F.R., 122 Wn. App. 324, 330, 93 P.3d 951 (2004))).

based on untenable grounds or untenable reasons under the abuse of discretion standard." In re Marriage of Fahey, 164 Wn. App. 42, 56, 262 P.3d 128 (2011).

"The child relocation act (CRA), [former] RCW 26.09.405–.560 [2008], provides notice requirements and standards for changing the primary residence of a child who is the subject of a court order regarding residential time." McNaught, 189 Wn. App. at 553. The person proposing to relocate with the child must provide their reasons for the intended relocation, and a person entitled to residential time or visitation may object. McNaught, 189 Wn. App. at 553. "Upon a proper objection, a trial court must conduct a fact-finding hearing on the proposed move" pursuant to RCW 26.09.520. McNaught, 189 Wn. App. at 553. Under RCW 26.09.520, "[t]here is a rebuttable presumption that the intended relocation of the child will be permitted" when the child resides with the parent seeking to relocate the majority of the time. To rebut this presumption, the challenging parent must demonstrate that "the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person." RCW 26.09.520. In making this determination, the "trial court[ ] must consider all of the child relocation factors." Horner, 151 Wn.2d at 894; RCW 26.09.520(1)-(10). "The factors are not weighted or listed in a particular order." Horner, 151 Wn.2d at 887. In short, "'[t]he CRA shifts the analysis away from only the best interests of the child to an analysis that focuses on both the child *and* the relocating person.'" McNaught, 189 Wn. App. at 553 (emphasis added) (quoting Horner, 151 Wn.2d at 887).

With regard to the substance of Teresa's petition to relocate, the court

erred when it concluded that most of the factors were either neutral or weighed against relocation. To the contrary, we conclude that most factors weigh in favor of relocation and the detrimental effect of relocation does not outweigh its benefits. Thus, the trial court erred in denying Teresa's petition.

1. Relocation factor 1 requires the court to consider "[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1).

With regard to this factor, the court found that "the core of the mother and [E.C.]'s family support live in the State of Washington and within easy driving distance of each other." It found that this factor went against relocation.

E.C. has a strong bond with both of her parents and her paternal and maternal grandparents. But E.C. has a significant amount of family in Seattle *and* Mexico. For example, Teresa's family lives in Mexico: her mother and stepfather live very close to her Lake Chapala home, and Erica lives four blocks away. E.C. has had a close relationship with Teresa's mother and stepfather. Living in Jalisco would allow E.C. to continue to be close with this side of her family. In addition, Teresa continues to foster a relationship between E.C. and her half-siblings who live in the United States. She speaks regularly with E.C.'s half-siblings' mothers and testified, "[I]t is important to me that E.C. know both [L.M.] and S.W." Thus, in Mexico, E.C. will have the opportunity to foster a relationship with both of her siblings, albeit virtually.

On the other hand, Caroleen testified that E.C. and E.C.'s half brother,

L.M., as well as L.M.'s half brother, C.M., are very close and that "E.C. loves to be around [L.M.]." Before E.C. moved, she saw L.M. at least once a month. In addition, E.C. is very fond of Caroleen, whom E.C. spent "almost every weekend" with when Ngoni and Teresa moved to Seattle. E.C.'s other maternal grandparents, Teresa's stepbrother and his partner, her cousins, and her aunts also live in the Seattle area or other parts of Washington. In short, while E.C. has strong relationships in Mexico, E.C.'s relationships in Seattle are equally as important. In particular, because of E.C.'s close relationships with Caroleen and L.M., this factor is neutral.

2.      Under relocation factor 2, a trial court must consider whether, before dissolution proceedings began, the parties had an agreement to relocate. RCW 26.09.520(2).

Here, the court found "that the evidence clearly shows that there was no agreement to move the family to Mexico and certainly there was no agreement for [E.C.] to relocate to Mexico without both parents."

This finding is contrary to the evidence presented at trial and Ngoni's testimony. Indeed, Ngoni testified that, prior to his trip to Zimbabwe, he and Teresa planned to move to Mexico to be with Teresa's family and that when he returned, they continued planning to move and relocate their business. In addition, Ngoni and Teresa are signatories to the Mexico home loan agreement, indicating he was aware of and approved of the home's purchase. Teresa testified that she signed as a power of attorney because Ngoni was unable to attend the signing of the loan agreement. Although Ngoni testified that he

24

thought the plans would change in the face of the divorce, the evidence clearly supports a finding that the parties had a prior agreement to move to Jalisco. Therefore, the trial court's finding was made in error, and this factor weighs in favor of relocation.

3.      Relocation factor 3 requires the court to consider "[w]hether disrupting the contact between the child and the person seeking relocation would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation." RCW 26.09.520(3).

The court found that "[E.C.] is 6 years old and loves both her parents and disrupting the contact with either one would be harmful for her at this age."

Teresa and E.C. have a strong bond, and E.C. spent the majority of her residential time with Teresa during the dissolution proceedings, including moving to Mexico. But E.C. and Ngoni also have a very strong bond, and while in Mexico, E.C. maintained regular contact with her father and her grandmother via video communication on the Internet. While video communication is not the same as in-person communication, Ngoni and Caroleen still will be able to teach E.C. about her heritage and help her learn Shona. And because E.C. was primarily in her mother's care prior to and during the dissolution and because E.C. moved to Jalisco with her mother for a period of time, the disruption between Ngoni and E.C. would be less detrimental to E.C. than the disruption between E.C. and Teresa. Therefore, this factor weighs in favor of relocation. Cf. In re Marriage of Grigsby, 112 Wn. App. 1, 10, 57 P.3d 1166 (2002) (concluding that the detrimental effects of relocation outweighed the benefits

25

where the children had not been to the proposed city of relocation and had minimal contact with the relocating parent's partner with whom she planned to live).

4.      Under relocation factor 4, the court must consider "[w]hether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191."  RCW 26.09.520(4).

The temporary plan did not include any restrictions pursuant to RCW 26.09.191.  And the trial court concluded that this factor did not apply because it made no findings under RCW 26.09.191.  Therefore, we do not include an analysis of the propriety of RCW 26.09.191 factors, and this factor is not applicable.

5.      Pursuant to relocation factor 5, the court must consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation."  RCW 26.09.520(5).

As an initial matter, we conclude that the trial court did not err in finding that "the father's reasons for objecting to the move were given in good faith." There is no evidence to the contrary.

However, the court made the following finding regarding Teresa's reason for relocating:

> While the court stops short of finding "*bad faith*" for mother's reasons for relocation, the court finds that the mother did not provide anything more than a "*dreamy*" idea of her fantasy to build a house and live in Mexico where she would be close to her own mother.  But, unlike a relocation to a destination in the United States, mother's relocation is to a foreign country.

The court also found that the "[m]other's argument that she has built a house in Mexico, cannot substitute for her lack of candor with the court. The mother's decision to purchase real property in Mexico, was nothing more than a rushed decision on a whim."

Both of these findings are contrary to the evidence in the record. Specifically, before dissolution, Teresa and Ngoni discussed moving to Mexico, and they jointly purchased property near Lake Chapala. Additionally, Teresa has had successful Pilates retreats in Mexico, knows that there is a market for an additional Pilates studio in the area of relocation, and has a home and a studio in Lake Chapala. Indeed, Teresa had many good reasons to relocate, including her family's presence, the significantly decreased cost of living—and therefore higher quality of life—and the business opportunities available in Mexico. Similarly, Teresa's Seattle business, Pilates Into Life, was shut down because it continued to lose money. And Teresa's parents, who had been allowing her to live at their rental property, sold their home, which required Teresa to move out of the property and pay a substantially increased rent if she were to remain in Seattle.

Furthermore, as discussed below, the cost of E.C.'s education, housing expenses, and general living expenses are much cheaper in Jalisco. Teresa reasonably believed the relocation was in her and E.C.'s best interests, and there is no evidence that she acted in bad faith. Therefore, this factor weighs is neutral.

6.     Under RCW 26.09.520(6), the trial court must consider "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation

27

or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child."

Here, E.C. "is bonded with both of her parents and does not have any special needs." E.C. has now moved to Jalisco and back to Seattle, causing quite a disturbance in her life. And she is at an impressionable age. Specifically, E.C. was six when trial began, and this is a great time for her to experience a new culture and to learn a new language, as she was doing at her school in Mexico. E.C. also can learn Shona by video conferencing with her grandmother and Ngoni. Nonetheless, as is normally the case, E.C. will be affected if permanent relocation were to happen. But given E.C.'s age and the most recent events in her life, this factor weighs in favor of relocation.

7. Relocation factor 7 concerns "[t]he quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations." RCW 26.09.520(7).

The court concluded that this factor was neutral. To this end, it found that "[b]oth Lake Chapala, Mexico and the Seattle area provide resources and opportunities for [E.C.]. While mother has painted a picture that she would have a better standard of life in Mexico, without an authorization for employment in Mexico, it is not clear how she would be maintaining her everyday expenses."

This finding is supported by substantial evidence. The quality of life in Mexico would provide a diverse and culturally rich experience for E.C. Teresa described Lake Chapala as "very safe," with "many activities in the area," including plant nurseries, restaurants, an outdoor mall, a live theater, and a

28

movie theater. She testified at trial that she and E.C. went to the ballet, the Baile Folklorico, in "a small town about five minutes away from where [they] live." She also explained that E.C. was enrolled at The Land, a Waldorf based bilingual school. In Mexico, the Waldorf-like education at the Land costs Teresa $2,500 per year and teaches E.C. in a bilingual environment. In Seattle, the same quality education would cost her $17,000 per year. Teresa testified that E.C. has been learning Spanish quickly and that, since her move to Jalisco, she has learned how to swim. Seattle offers many similar opportunities, but they are more expensive and therefore less accessible for E.C. and her family. Furthermore, although E.C. will experience and learn from her father's Zimbabwean culture if she remains in Seattle, which is equally important to E.C.'s development, because of the accessibility and affordability that Jalisco provides for culturally rich experiences, this factor weighs in favor of relocation for the added quality of life.

8.     Under RCW 26.09.520(8), the court must consider "[t]he availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent."

With regard to the eighth factor, the court found that "Facetime and Skype contact are viable options to keep regular contact between father and [E.C.]. [E.C.] can have extended visits during summer months and holidays/school breaks."

Although living in separate countries is not ideal for any child and parent relationship, there are alternatives to in-person visitation, including FaceTime.

29

Moreover, with the world's increasing mobility, it is much more affordable and convenient to travel regularly. The evidence supports the court's finding, and this factor weighs in favor of relocation.

9.      Relocation factor 9 requires that the court consider "the alternatives to relocation and whether it is feasible and desirable for the other party to relocate also." RCW 26.09.520(9).

Under factor 9, the court found that Teresa had no viable alternatives to moving and that "no viable alternative plans proposed for the father to relocate to Mexico."

Here, because Teresa's parents' Seattle home has been sold and Teresa's business has closed, the alternative to relocating is not preferable. That is, staying in Seattle would require Teresa to find new employment and housing, and in Mexico, Teresa's business was up and running at the time of the trial and had dates set for Pilates retreats.

However, the court was reasonably concerned regarding Ngoni's citizenship status in the United States and his ability to obtain citizenship status in Mexico. Moreover, his opposition to the relocation is not unfounded. As such, Ngoni's relocation is not a viable alternative. Therefore, this factor is neutral because both parties do not have viable alternatives.

10.     Relocation factor 10 requires the court to consider "[t]he financial impact and logistics of the relocation or its prevention." RCW 26.09.520(10).

With regard to this factor, the trial court found that the "mother has challenges in Seattle or in Mexico." To support this determination, the court

found: "In Mexico, after nearly 9 months since her temporary relocation, she has not secured employment, has not set up a Pilates studio and has not secured authorization for employment." As discussed, this latter finding is unsupported by the uncontroverted evidence. As to the former finding, it is clear from the evidence that the challenges in Seattle far outnumber those in Mexico.

In Mexico, Teresa already has a home and a connected Pilates studio. Relocating could provide financial gain, including payments from Pilates retreats that were scheduled at the time of trial, and a higher standard of living for her and E.C. In Seattle, Teresa no longer has a home with rent she can afford, and her business is now defunct. As such, this factor weighs in favor of relocation.

The decision to grant relocation often results in a parent being separated from their child. Each circumstance is different, and that is why the court is required to consider the nonweighted and nonprioritized factors in making findings that support its determination. Ultimately, E.C. is fortunate to have two loving parents who want to care for her and provide her the best life. And she tells her father that she loves being in Mexico and Seattle. However, when the presumption is applied and the benefits for E.C. and Teresa are assessed, the factors weigh in favor of relocation. Ngoni failed to show that the detrimental effects of relocation to Jalisco outweigh the benefits to Teresa and E.C. We therefore reverse the trial court and direct the court to grant Teresa's petition to relocate with E.C.

*Restraining Order*

Teresa contends that the trial court erred when it denied her motion for a

permanent restraining order. We remand this issue for determination by a different judge.

"In entering a decree of dissolution of marriage . . . the court shall . . . make provision for any necessary continuing restraining orders." RCW 26.09.050(1). In other words, RCW 26.09.050(1) affords the trial court discretion to discern the necessity of a continued restraining order. And we review a trial court's discretionary decision or order for an abuse of discretion. In re Marriage of Angelo, 142 Wn. App. 622, 639, 175 P.3d 1096 (2008).

The trial court concluded that an incident where Ngoni brought two new machetes to Teresa's home and showed them to Teresa in front of E.C. was not enough to justify a restraining order and that Ngoni's mental health was not cause for concern regarding Teresa's safety. The court also noted that Teresa never reported an incident of domestic violence and that no witness testified that Ngoni acted violently toward Teresa or E.C. It therefore denied the restraining order, finding no credible evidence that "[Ngoni] represents a threat to [Teresa]."

Although the trial court did not err when it concluded that Malloy's and Wahl's testimony of domestic violence does not support the determination that there was a history of domestic violence in *this* case, there was additional evidence that Teresa was reasonably fearful. In particular, although Ngoni did not threaten Teresa directly, during his psychiatric appointments with her present, he admitted to having had thoughts about killing or hurting her. Teresa also presented evidence that Ngoni raped her in high school. Moreover, following her petition for dissolution, Ngoni brought machetes into Teresa's

house with seemingly no purpose beyond intimidating Teresa, and while he contended they were for camping, Ngoni did not testify that he camps on a regular basis or at all. In addition, we note that it is often the case that domestic violence goes unreported,[12] and a trial court should not base its determination of domestic violence history on a lack of reported incidents or the lack of recent incidents of domestic violence. See Spence v. Kaminski, 103 Wn. App. 325, 334, 12 P.3d 1030 (2000) (concluding that the court does not need a recent allegation of domestic violence to issue a protection order). Therefore, because the court dismissed Teresa's concerns entirely and because the court showed bias by inappropriately considering extrajudicial information, we remand to the trial court to determine whether the restraining order is appropriate.

*Attorney Fees*

As a final matter, Teresa contends that the trial court erred when it denied her request for attorney fees. Because the record supports the trial court's determination that Ngoni was not intransigent during the proceedings, we disagree.

We review an attorney fee award for an abuse of discretion. In re

---

[12] Only "'roughly fifty-five percent of women in the U.S. who have been victims of domestic violence report the abuse.'" Ajmel Quereshi, 287(G) and Women: The Family Values of Local Enforcement of Federal Immigration Law, 25 WIS. J. L. GENDER & SOC'Y 261, 287 (2010) (quoting Katerina Shaw, Barriers to Freedom: Continued Failure of U.S. Immigration Laws to Offer Equal Protection to Immigrant Battered Women, 15 CARDOZO J. L. & GENDER 663, 678 (2009)); see also Vito Nicholas Ciraco, Fighting Domestic Violence with Mandatory Arrest, Are We Winning?: An Analysis in New Jersey, 22 WOMEN'S RTS. L. REP. 169, 178 (2001) ("[U]nderreporting is a problem with all victims of spousal abuse.").

Marriage of Burrill, 113 Wn. App. 863, 873, 56 P.3d 993 (2002). "A trial court abuses its discretion if its decision is based on untenable grounds or untenable reasons." In re Marriage of Coy, 160 Wn. App. 797, 807, 248 P.3d 1101 (2011). In a dissolution proceeding, "[a] trial court may . . . award attorney fees if one spouse's intransigence increased the legal fees of the other party." Burrill, 113 Wn. App. at 873. Specifically, "RCW 26.09.184(4)(d) allows a trial court to award attorney fees if it finds 'that a parent has used or frustrated the dispute resolution process without good reason.'" Coy, 160 Wn. App. at 808.

The trial court denied attorney fees, deciding the issue based on the mother's "heavy-handed" trial practice. While we do not agree that this is a tenable reason for denying attorney fees, the trial court's finding that Ngoni was not intransigent is supported by substantial evidence. Specifically, Ngoni did not draw out legal issues; did not make unsubstantiated, false, and exaggerated allegations against Teresa concerning her fitness as a parent; and did not cause Teresa to incur unnecessary or significant attorney fees. Cf. Burrill, 113 Wn. App. at 873 (holding that an award of attorney fees was proper where the appellant had made unsubstantiated, false, and exaggerated allegations that caused the respondent significant, unnecessary attorney fees).

Teresa points only to Ngoni's failure to have UA results sent to Teresa as required by court order. But Teresa provides no evidence that he did so purposefully, and there is no evidence that it created a substantial burden or unnecessary attorney fees. Furthermore, she provides no other argument or basis in law or in the record to conclude that she was entitled to fees. Therefore,

she is not entitled to attorney fees.

CONCLUSION

Having determined that the court's findings of fact are not supported by substantial evidence and do not support the designation of Ngoni as the parent with whom E.C. should reside the majority of the time or the denial of Teresa's request for relocation, we vacate the parenting plan and reverse the trial court's order denying Teresa's petition to relocate to Jalisco with E.C. We remand to the trial court for entry of an order granting relocation and a parenting plan consistent with our ruling. We recognize that in addition to entering a parenting plan, which may require a transition period, the new trial judge will need to determine whether the parenting plan should contain RCW 26.09.191 restrictions and whether it should grant Teresa a restraining order.

_____
Smith, J.

WE CONCUR:

_____     _____
Coburn, J.                    Appelwick, J.